STATE, EX REL. ATTORNEY GENERAL, *v.* STATE BOARD OF EDUCATION.

4-4945

Opinion delivered December 20, 1937.

*Jack Holt,* Attorney General, and *Leffel Gentry,* Assistant, for appellant.

*Rose, Hemingway, Cantrell & Loughborough,* for appellee.

GRIFFIN SMITH, C. J. By the terms of act 162, approved March 1, 1937, the State Board of Education, subject to approval of the Governor, is authorized to issue and sell "State Board of Education Bonds."

The state, on relation of the Attorney General, filed complaint in the Pulaski chancery court, alleging that certain authority which act 162 undertakes to confer upon the State Board of Education is in excess of the legislative power, in that Amendment No. 20 to the state constitution, adopted in 1934, prohibits the pledging of any of the state's revenues. That amendment is:

"Except for the purpose of refunding the existing outstanding indebtedness of the state and for assuming and refunding valid outstanding road improvement district bonds, the state of Arkansas shall issue no bonds or other evidences of indebtedness pledging the faith and credit of the state or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the state voting on the question at a general election or at a special election called for that purpose."

Specifically, the complaint alleges that, unless restrained, the State Board of Education, in pursuance of resolutions adopted November 3, 1937, will issue bonds in the sum of $240,000, and, as security for the payment of principal and interest, will pledge the revenues in question. The demurrer was sustained, and the Attorney General appealed.

Act 162 authorizes the State Board of Education [hereinafter sometimes referred to as the "Board"] to issue its bonds, and to take as security any school district bonds in the state treasury on which loans were made from the revolving loan fund. The Board is permitted to deposit such district school bonds with a designated trustee, who shall have a right to sell them should default occur in payment of principal or interest on the Board of Education bonds. The total amount of bonds to be issued shall not exceed 50 per cent. "of the total then outstanding balance of loans made from the revolving loan fund."

Proceeds of bonds so sold shall be paid into the state treasury to the credit of the revolving loan fund, and the Board is empowered to make loans to any school district in the state, to be used in buying "the outstanding bonds and other valid indebtedness at a discount, and to accept such bonds so bought, together with a pledge of the state apportionment of school funds to said district as collateral or security for the loan." Certain conditions are attached which are not material to this opinion.

In *Davis* v. *Phipps*, 191 Ark. 298, 85 S. W. 2d 1020, 100 A. L. R. 1110, questions somewhat similar to those

involved in the instant case were before the court. Davis, as a citizen and taxpayer, undertook to enjoin Phipps as Commissioner of Education from carrying out a plan to sell bonds issued by the State Board of Education. The Board contended that full authority was conferred by act 333 of 1935; that the proposed securities purported to be revolving loan fund bonds, issued by the State Board of Education, and that there was an express provision in act 333 prohibiting the full faith and credit of the state from being pledged. In commenting upon the end Amendment No. 20 was intended to serve, and the purpose of its promulgation, we said:

"The financial affairs of our commonwealth had been well-nigh wrecked by issuance of bonds far in excess of the amount justified by the liquid resources of the state. High taxes had been imposed to raise revenues to meet these enormous obligations. It was well understood then, as it is now, that a continuation of these practices that had grown up was pyramiding debts and tapping every source of revenue for payment thereof, and could not continue without practical bankruptcy. . . . When we refer to the revenues of the state, we usually mean the annual or periodic yield of taxes, excises, customs, etc., which the state collects and receives into the treasury for public use, but the word 'revenues' may be much broader than that, as it may include rent, yield, as of land, profit. It includes annual and periodical rent, profits, interest, or issues of any species of property, real or personal, income. The yield from taxes is one of the last meanings given in Webster's International Dictionary, yet it is the one with which we have most to do in questions such as are presented here.

"It must be remembered that the bonds pledged in this case as security were bonds issued by school districts delivered to the State Board of Education as security for money obtained from the revolving loan fund. This is not, in fact, strictly a part of the state's revenues, as distinguished from school funds. It is a part of the assets belonging to this revolving loan fund, but is, for practical purposes, as distinct from the State as

are school districts, or improvement districts, about which no question is ever raised as to their individual entity, as distinguished from the state. These school districts and improvement districts are in some senses, at least, merely agencies of the state, organized under proper authority to render a certain service to particular localities.

"The revolving loan fund is not confined to any individual locality, but is limited to a particular and individual purpose, designated to render a service not otherwise provided for. If, by a strained construction, we should say that these funds in the hands of the State Board of Education are funds of the state, we can with the same parity of reasoning say that the State Board of Education, through the revolving loan fund, shall not issue any bonds, because it is only an agency of the state, and, by the same process of deduction, if we hold one agency of the state without power or authority, we may in like manner hold all other agencies of the state, as school districts and improvement districts, impotent in borrowing money or issuing bonds."

After referring to the fact that the proposed bonds were not issued by the state itself, the opinion continues:

"In the second proposition our conclusions are not without eminent authority to the effect that revenues mentioned in Amendment No. 20 as revenues of the state do not include the securities pledged with the State Board of Education, nor the interest derived from these securities. An imposing array of authorities showing the distinction between revenues collected by the state for its support and maintenance, and those collected by state agencies or subdivisions, could easily be cited. . . . Finally, it may be suggested that the pledges contemplated by the State Board of Education are not within the forbidden class for another reason; that is, under Amendment No. 20 it would seem that pledges of revenue are forbidden only when such pledges are to secure state bonds. This seems to be in accordance with the language of Amendment No. 20."

This appeal cannot be disposed of in an intelligible manner without tracing the origin of the funds affected, and identifying the purposes of the various acts under which such funds were created. This court takes judicial notice of the public records and reports of the several departments of the state, when required by law to be so made and filed.

The State Comptroller's biennial report, dated December 1, 1934, reviews the history of the permanent school fund, and other state funds, with particular reference to those intended for educational purposes. Beginning at page 42, it is shown that in 1917 the permanent school fund had a credit balance of $1,134,500, evidenced by bonds of the state drawing 3 per cent. interest. By act 128 of 1917, these securities were converted into 5 per cent. bonds or notes, the corpus to remain the property of the permanent school fund, and the interest only to be used for common school purposes. A sinking fund was created, and from such sinking fund, interest on the permanent school fund was payable to the common school fund. By act 356 of 1921, $180,000 was transferred from the permanent school fund for use of the penitentiary, and by act 199 of 1925, $100,000 was transferred for the benefit of the State Teachers College at Conway. These two items, aggregating $280,000, for which the State Debt Board placed with the permanent school fund state five per cent. bonds, increased to $1,414,500 the state's debt to the permanent school fund.

In 1927, by act 119, the revolving loan fund was created, the provisions of which were, with slight changes, brought forward into act 169 of 1931. Act 169 was a recodification of the school laws. It vested the State Board of Education with power to "manage and invest the permanent school fund of the state." Section 103 of act 169 expressly perpetuated the revolving loan fund "For the purpose of aiding needy school districts in repairing, erecting and equipping school buildings and paying for outstanding indebtedness on buildings heretofore erected, and equipment heretofore purchased."

228

The State Board of Education was directed, not later than June 15 of each year, "To determine the approximate amount of money the school districts may need and be entitled to borrow from the revolving loan fund," and the Board "shall make requisition on the State Debt Board for the placing of said amount in the revolving loan fund. Thereupon the State Debt Board ... shall cause to be ... sold ... an amount of state bonds necessary to carry out the provisions of this act, pertaining to the revolving loan fund. ... Such bonds shall ... pledge the credit of the state for the prompt payment thereof, and the interest thereon. ... The proceeds of such sale shall be promptly paid into the state treasury to the credit of the general revenue fund, and then immediately transferred to the permanent school fund, and applied to the discharge of an equal amount of the state debt to the permanent school fund. ... The state treasurer shall, immediately after the first day of July in each year, transfer to the general revenue fund, all cash on hand belonging to the permanent school fund. In complying with the requisition made on it by the State Department of Education for money to be placed in the revolving loan fund, the State Debt Board shall take into consideration the cash on hand to the credit of the permanent school fund."

Act 119 of 1927, wherein the revolving loan fund was created, as mentioned *supra*, authorized the Debt Board to sell bonds in an amount equal to eleven-tenths "of the amount so called for by the State Board of Education." An appropriation of $1,500,000 was made to be used in discharging an equal amount of the state's debt to the permanent school fund, "incurred by authority of act 128" of 1917.

Following the passage of act 119 in 1927, and prior to 1931, $1,000,000 of bonds of the issue of $1,500,000 authorized by act 119 were marketed, and the net proceeds ($996,000) were credited on the state's debt to the permanent school fund. This left a net balance of $418,500. The additional bonds ($500,000) authorized by act 119 were not sold.

During the period of these transactions, funds from other sources were being regularly paid into the state treasury to the credit of the permanent school fund. The State Debt Board, as the business or managing agency of the permanent school fund, proceeded to "invest" such fund, under the mandates of acts creating and perpetuating the revolving loan fund.

Act 333, which became a law on April 4, 1935, without the Governor's signature, directed issuance of revolving loan fund bonds "To provide funds to lend to school districts to enable them to purchase their own bonds at a discount." This purpose was an enlargement upon uses under act 169 of 1931, the difference being that, while under act 169 use was limited to "Aiding needy school districts in repairing, erecting and equipping school buildings and paying for outstanding indebtedness on buildings heretofore erected, and equipment heretofore purchased," under act 333 funds so realized were available to school districts in purchasing their outstanding bonds at a discount. This is the exact purpose to be served under act 162 of 1937. By § 16, act 333 is expressly repealed.

Admittedly, the full faith and credit of the state are not pledged to the repayment of the principal of bonds the board proposes to issue under act 162; nor, by express language, are any of the revenues of the state pledged to the repayment of principal or interest. It is necessary, therefore, to determine whether, in fact, state revenues are pledged as an incident to repayment of pledges.

Although there are no statistics available in any current departmental report, of which this court will take notice, showing receipts to the credit of the permanent school fund from various sources established by the state, it is clear that the state, after crediting $996,000 on its indebtedness of $1,414,500 to the permanent school fund, owed a balance of $418,500; and from the sinking fund, interest at 5 per cent. on this obligation is being paid to the common school fund, under authority of law. Other moneys accruing to the permanent school

fund, by virtue of enactments prior to 1933, supplied revenues additional to the corpus of the state bonds and the interest thereon.

By act 55, approved February 25, 1933, act 169 of 1931 was amended to read as follows:

"The proceeds from the sale of all lands that have been, or hereafter may be granted by the United States to this state, and not otherwise appropriated by the United States to this state, and also all moneys, stocks, bonds, lands, and other property now belonging to any fund for purposes of education; also, the net proceeds of all sales of lands and other property and effects that may accrue to this state by escheat, or from sales of estrays, or from unclaimed dividends, or distributive shares of the estates of deceased persons; also any proceeds of the sale of public lands which may have been, or may be, hereafter, paid over to the state (Congress consenting); also all the net proceeds of the sale of all state lands, including land sold for taxes, and it shall be the duty of the state treasurer to set aside this amount to the credit of the land sales fund when he receives the proceeds of such sales from the State Land Commissioner; also all the grants, gifts, or devises including sales for the year 1930-1931, and shall at the end of each fiscal year transfer all unappropriated balances to the credit of the permanent school fund, that have been or hereafter may be made to this state, and not otherwise appropriated by the terms of the grant, gift or devise, shall be securely invested and sacredly preserved as a public school fund which shall be designated as the permanent school fund of the state, and which shall be the common property of the state for public school purposes only. The permanent school fund shall remain inviolate and intact, and the interest thereon only shall be expended for the maintenance of the schools of the state."

It seems conclusive from the record before us that revenues accruing under the terms of act 55, and all revenues standing to the credit of the permanent school fund, must be regarded as "the common property of

the state for public school purposes only," and it follows that when loans are made from this fund (only the interest of which may be expended currently) and the proceeds transferred to the revolving loan fund for investment in the bonds of particular school districts, both the State Debt Board and the State Board of Education act as agents of the state in investing this common property.

In *Davis* v. *Phipps,* it is correctly stated that school districts are not, strictly speaking, a part of the state in the sense that the General Assembly must deal with them. Like levee and drainage improvement districts, counties, cities and towns, they do not require biennial appropriations, but may function in a *quasi*-independent manner by virtue of continuing statutes or constitutional provisions. This is not true with respect to the State Board of Education, and some other departments of the state. Indeed, like the offices of State Comptroller, State Bank Commissioner, and similar agencies, these "offices" (if in fact they are such) cannot be made permanent, but are subject to the will of the legislative branch. Article 19, § 9, Constitution of 1874.

We again hold, as we did in *Davis* v. *Phipps,* that the revenues of school districts are not revenues of the state, within the meaning of amendment No. 20. But it does not necessarily follow that money paid into the state treasury by such school districts as interest on loans made from the permanent school fund through instrumentality of the revolving loan fund and the State Debt Board, or the State Board of Education, may not in part become revenues of the state. By appropriate legislation either the State Debt Board, or the State Board of Education, may be authorized to lend the assets of the permanent school fund through any properly designated instrumentality, such as the revolving loan funds, and as security for the loans so made, bonds of school districts may be accepted. Either board may act as a business or accommodation agency and issue and sell its own bonds in substitution of the bonds pledged by the school districts, paying only such interest as it

receives from the districts, and being liable only to the extent of the collateral which it pledges. Any excess interest paid by such school district becomes revenue of the state and a part of the assets of the permanent school fund. The public characteristics, attributes, and state ownership of such revenue are expressly affirmed.

Section 4 of act 162 contains the following provision, not found in act 333 of 1935: "As soon as any bonds are issued and sold under this act, the State Board of Education shall set aside from any money in the revolving loan fund enough money to pay the first twelve months' maturities of bonds and interest of the bonds sold. If in any year the collections from the pledged revolving loan fund bonds are not sufficient to pay the next twelve months' maturities of the bonds sold, the amount of the deficit shall be immediately paid into the fund for the payment of State Board of Education bonds from the revolving loan fund." Also, it is provided that "In pledging revolving loan fund bonds to secure bonds issued under this act, the State Board of Education shall pledge such an amount of the revolving loan fund bonds as it may deem advisable to secure bonds issued hereunder, not to exceed twice the amount of the bond issue being secured."

No similar provisions were included in act 333 of 1935, upon which the decision in *Davis* v. *Phipps* was predicated.

The term "pledging revolving loan fund bonds" is somewhat misleading. The loans contemplated by act 162 are not based upon bonds to be issued by the revolving loan fund. The bonds of individual school districts, executed and pledged for moneys received from the permanent school fund through the agency of the revolving loan fund and the State Board of Education, are held by or for the account of the revolving loan fund, and these securities in turn, are held by the revolving loan fund for the permanent school fund.

We are of the opinion that act 162 does, in fact, authorize the pledging of revenues of the state. To that extent it is in contravention of amendment No. 20, and invalid.

Having reached this conclusion, it is unnecessary to determine other points raised by appellant.

The action of the chancery court in sustaining the demurrer is reversed, and the cause is remanded with directions to overrule the demurrer and to proceed in a manner not inconsistent with this opinion.

### SUPPLEMENTAL OPINION

GRIFFIN SMITH, C. J. Appellee, State Board of Education, has petitioned the court to extend the original opinion in this cause, in order that there be a determination of issues raised in the pleadings which we felt it unnecessary to consider.

The opinion handed down December 20, 1937, contains a partial *resume* of the origin and development of the permanent school fund, with mention of its relation to and use by the revolving loan fund.

In the petition for consideration of the pretermitted issues, it is urged that the court should draw a distinction between those sources of credits accruing to the permanent school fund mentioned in the original opinion, and moneys arising from the sale of sixteenth section lands, which belong to that fund. The court is also asked to construe § 15 of act 162 of 1937, and § 9-A of act 154 of the same session.

Act 154 is entitled "Arkansas Retail Sales Tax Law." It is "An act to provide for raising revenue to sustain the common schools." Other purposes mentioned in the caption include library service.

In the subtitle, "Remittances and Distribution," this being the introduction of § 9-A, it is directed that the "person" making the monthly return shall pay the tax to the Commissioner of Revenues. Of the moneys received by the Commissioner, he shall pay into the state treasury to the account of the common school fund fifty per cent. thereof, and "The money paid into the common school fund shall be used only for the payment of warrants issued for the maintenance of schools and said library service, to be paid in order of registration as now provided by law." The act was approved February 26, 1937.

Section 15 of act 162 is: "The Commissioner of Education shall withhold all or any part of the state apportionment that a school district may receive whenever it is necessary, in his opinion, to do so to prevent such district defaulting, or a district has defaulted, in payment of either principal or interest of its revolving loan fund bonds, and he shall apply the funds so withheld in payment of said district's bonds or interest until all danger of default or said default is cured." Act 162 was approved March 1, 1937.

If act 162 had been approved prior to approval of act 154, the pertinent provisions contained in § 15 of act 162 would have been rendered inoperative by the language in § 9-A of act 154 prohibiting the revenues in question from being used for any purposes other than those particularly enumerated. But it was not so passed or approved. On the contrary, act 154 was in full force and effect before act 162 was signed.

The general assembly, having declared that its purpose was to have the various sections of each act construed as severable, if necessary, it follows that the lawmakers, knowing that § 15 of act 162 and § 9-A of act 154 were in conflict, and knowing that said § 15 could not be administered as to funds available for apportionment accruing from sales tax allotments without enlarging the uses to which that fund could be put, as expressed restrictively in § 9-A, and no reservation having been made in act 162 for excluding from the fund directed to be so withheld any sales tax money, it seems clear that the intent must have been to authorize the Commissioner to withhold "all or any part" of the state's apportionment to school districts in the circumstances mentioned in § 15. This would necessarily include sales tax funds.

Support for this construction is found in the language of act 162, making the Commissioner of Education the state's agent to first withhold and then apply the money, as directed. We hold, therefore, that this duty is incumbent upon the Commissioner.

We are of the opinion that funds arising from sales of sixteenth section lands are revenues of the state within the meaning of Amendment No. 20 to the Constitution, and cannot be pledged as security for the payment of bonds.

If the taxing powers of the state may be set in motion to create a fund dedicated to a specific purpose, such as schools, or highways, or public health; and if, after such fund has been collected and deposited in the state treasury for distribution in accordance with the objective, it can then be said that such funds become the absolute and unconditional property of this adopted child of state solicitude, to the exclusion of all rights of the state and to the exclusion of sovereign title, then the way is clear for uncurbed evasion of the spirit of Amendment No. 20. Nor is there persuasive reason for a different construction as to that class of cases where use of the money is of constitutional cognizance, as distinguished from legislative address.

It is true, as shown by appellee, that Congress, by an act of 1843, authorized legislatures of Illinois, Arkansas, Louisiana, and Tennessee to provide for the sale and conveyance in fee simple of all or any part of the sixteenth section lands, with directions to invest the money arising from such sales ''in some productive fund, the proceeds of which shall be forever applied, under the direction of said legislatures, to the use and support of schools within the several townships and districts of country for which they were originally reserved and set apart, and for no other use or purpose whatever.''

In *Mayers et al.* v. *Byrne et al.,* 19 Ark. 308, there is a history of the several acts of Congress relating to sixteenth section lands, and to acts of the general assembly of Arkansas dealing with them. The effect of *Mayers* v. *Byrne,* and of the decision in *Cooper* v. *Roberts,* 18 How. (U. S.) 173, 115 L. Ed. 338, is that under the compact between the United States and the state of Arkansas there was a grant of the lands directly to the state, without any limitation of the state's power to deal with such lands, or with the funds arising from their sale, and that

no application to Congress was necessary to direct the appropriation of their proceeds. See *School District No. 36* v. *Gladish,* 111 Ark. 329, 163 S. W. 1194; *Special School District No. 5* v. *State,* 139 Ark. 263, 213 S. W. 961; *State of Alabama* v. *Schmidt,* 232 U. S. 168, 34 S. Ct. 301, 58 L. Ed. 555; *King County* v. *Seattle School District No. 1,* 263 U. S. 361, 44 S. Ct. 127, 68 L. Ed. 339; *Branch* v. *Mitchell,* 24 Ark. 431; *Hagar* v. *Reclamation District No. 108,* 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569; *United States* v. *Louisiana,* 127 U. S. 182, 8 S. Ct. 1047, 32 L. Ed. 66.

In *Sloan* v. *Blytheville Special School District No. 5,* 169 Ark. 77, 273 S. W. 397, it was said: "This court and the Supreme Court of the United States have uniformly held that the title to sixteenth section lands is vested absolutely in the state, and that the legislature has exclusive control over the funds. The provision of the Constitution, art. 14, § 2, is mandatory in its nature and would prevent the legislature from using the proceeds from these school lands for any other purpose than the support of the common schools. The language of the Constitution, however, does not limit the funds to the use of the particular district in which the sixteenth section lands are situated. The only restriction in the Constitution is that the money shall never be used for any other than school purposes. This was the dominant purpose guiding the court in the decision of *Special School District No. 5* v. *State,* 139 Ark. 263, 213 S. W. 961. While that decision does not state that the state is under a sacred obligation to carry out the purposes of the grant, expressed in the act of Congress, yet it clearly recognizes that the trust is a personal one, and that the manner of its execution is exclusively within the power of the legislature. In short, it recognizes that the manner of the execution of the trust is a matter of public policy of the state, which can only be exercised by the legislature. The result of our views is that the grant of the sixteenth section lands submitted to the state by the act of Congress and accepted by the state was of the fee to the lands without limitation upon the power of the state. It

is true that the grant imposed a trust which was accepted by the state; but the trust was of a personal nature and to be exercised by the state as a sovereign and was not a trust fixed upon the land itself and running with it."

On appeal to the Supreme Court of the United States, 275 U. S. 486, 48 S. Ct. 27, 72 L. Ed. 387, this case was affirmed on a per curiam order on authority of *Mills County* v. *Railroad Company,* 107 U. S. 557, 2 S. Ct. 654, 27 L. Ed. 578; *Alabama* v. *Schmidt,* 232 U. S. 168, 34 S. Ct. 301, 58 L. Ed. 555, and *King County* v. *Seattle School District No. 1,* 263 U. S. 361, 44 S. Ct. 127, 68 L. Ed. 339.

The effect of this extended opinion is to hold (1) that funds of the permanent school fund originating from the sale of sixteenth section lands are revenues of the state, the pledging of which to secure bonds issued under authority of act 162 of 1937 would be a violation of Amendment No. 20 to the Constitution of Arkansas, and (2) that § 15 of said act 162 is not inoperative because of the restrictions expressed in § 9-A of act 154 of 1937.