WALLS v. STATE BOARD OF EDUCATION.

4-5029

Opinion delivered March 7, 1938.

*Culbert L. Pearce,* for appellants.

*Jack Holt,* Attorney General, *Leffel Gentry,* Assistant, and *Miles & Amsler,* for appellees.

BAKER, J. This is a taxpayers' suit brought to restrain the State Board of Education from lending $200,000 to the board of control of a Blind School, under authority of act 239 of the Acts of 1937. It is charged in the complaint that the honorary board of management and operation of the School for the Blind, under act 239 of the Acts of 1937, is authorized to borrow from the permanent school fund, or any other available source, not to exceed $200,000, and to pledge and use the proceeds from the sale of the Blind School properties to liquidate such loan as may be obtained. The proceeds of any such loan is to be paid into the state treasury to the credit of the Blind School building fund. The treasurer was directed, by this act, to transfer from the general revenue fund to the Blind School building fund the sum of $50,000. This honorary board, so authorized to borrow this money, is empowered by the same act to construct new buildings for the Blind School, upon a part of the property now occupied by the School for the Deaf, the new buildings not to exceed in cost $300,000; the school for blind white persons not to exceed the cost of $250,000 and the buildings for the school for blind negroes not to exceed the cost of $50,000. There is a provision also by the said act

that the sale of the grounds now occupied by the schools for the blind shall be made and the money from the sale thereof shall be deposited with the treasurer of the state and the proceeds of this sale of the Blind School properties will be used to liquidate the loans. It was in contemplation, according to the act, that a grant would be obtained from the national government, or some of its agencies, of 45 per cent. of the total cost of these buildings and the remainder, or 55 per cent., to be paid from the money borrowed.

Section 11 of the aforesaid act makes an appropriation of $200,000, or so much thereof as may be necessary for the several purposes mentioned in the act, which includes payment for material, labor, expenses incurred in the appraisement, advertisement, and sale of property, construction of buildings, and for the performance of any and all other duties imposed upon the board, including payment of services of a fiscal agent, attorney and accountant. It may be a matter of doubt as to whether the legislature intended to appropriate the $50,000 taken from the general revenue fund and transferred to the Blind School building fund, except as included in the $200,000 appropriation.

It is charged in this complaint that this permanent school fund cannot be so used as contemplated under the provisions of this act and under the facts as stated and established in this proceeding by admission in the filing of a demurrer and by proof upon the only controverted fact question presented. The complaint alleges that the property of the Blind School is not worth exceeding $40,-000. Upon this particular paragraph of the complaint, issue was taken by answer and upon trial proof was offered that the value, including salvage for buildings located upon said property, was something less than the alleged $40,000. Witnesses' estimates range from about $26,000 to amounts slightly in excess of $38,000. The court sustained the demurrer and dismissed the complaint.

The issues presented are: (1) May the permanent school fund be loaned to build new blind school properties, and, (2) does such loan, if made by one state

agency to another, violate in any respect the provisions of amendment No. 20 to the constitution?

In answer to these questions perhaps a somewhat wide range of discussion will be necessary, but without attempting a more nearly complete or detailed analysis of the legal propositions involved, we will dispose of the questions in the order stated.

The permanent school fund, as the name implies, is one that may not properly be diminished by its use. While these funds may be loaned under conditions by which they are safeguarded, only the interest accruing may be used, and it may be said in passing that in lending these funds there is a presumption, by the term itself, that the money will be repaid or be refunded. A mere formal scheme or plan, whereby the money from that fund might be had in the guise of a loan without suitable and efficient provision for repayment, would be in effect an appropriation.

Permanent school funds arise out of certain forms of taxation, provisions for which were formulating and developing in the passage of act 119 of 1927, as at present organized, re-enacted by act 169 of 1931. The last act mentioned was amended by act 55 of 1933. For a more detailed history reference is made to *State, ex rel. Holt Attorney General* v. *Board of Education, ante,* p. 222, 112 S. W. 2d 18.

Ordinarily it might be presumed that, since these moneys arise and the funds are created by legislative enactment, and since the act is one that may be repealed, the fund is subject to the control of the legislature and may be disposed of by legislative enactment.

The acts, however, provide that such funds as have been collected, by their collection and accumulation constitute the permanent school fund of the state, and it must be recognized that these taxes so imposed and collected are collected for the specific purpose of making or building up this fund. Once it shall have been collected for the purposes indicated, it is safeguarded by provisions of the state constitution, which provide that it may not be diverted or used for any other purpose than that indicated by the law authorizing the collection, that is, to become a part of the permanent school fund of the state.

Section 2, Art. 14, of the constitution provides: "No money or property belonging to the public school fund, or to this state for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs."

Since such action of diversion is prohibited to be done by direction, it may not be done by indirection.

(2). That, however, does not answer the whole controversy raised here. We have already indicated that the interest or earnings from this school fund may be used. Therefore, it may be put out on interest or loaned in order that there would be some accruals, without a depletion of the fund. Therefore, if the honorary board may borrow the money, it may borrow it in such a way that the amounts contracted for will be repaid. It is certain that it may not be borrowed upon the credit of the state, wherein the resources or revenues of the state may be pledged, whether directly or indirectly, for the repayment, as that process would be violative of amendment No. 20 of the state constitution, which provides:

"Except for the purpose of refunding the existing outstanding indebtedness of the state and for assuming and refunding valid outstanding road improvement district bonds, the state of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the state or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the state voting on the question at a general election or at a special election called for that purpose."

But the draftsman of act 239 most probably had that proposition in mind and there was no provision of said act for any such pledge or guaranty of repayment of the fund, but the repayment is contemplated by a sale of the Blind School properties. We have already suggested that the Blind School properties were of the value of less than $40,000, according to the proof offered in this case. If the appropriation contemplated by this act be $200,-000, $50,000 of which comes from the general revenue fund, the $150,000 presumptively would come from the permanent school fund, less the 45 per cent. grant. If a

grant be obtained from the national government or any of its agencies for 45 per cent., the amount of that grant would be $90,000. The $90,000 and the $50,000 from the general revenue fund would amount to $140,000. The $60,000 of the permanent school fund so borrowed would be without security to repay it, except the Blind School properties, worth less than $40,000. Therefore, more than $20,000 must be treated as a donation.

If, according to § 5 of act 239, the honorary board should spend $250,000 for buildings for white blind children and $50,000 for the negro blind children, an additional $55,000 would have to be treated as a donation, if the grant were obtained for 45 per cent. as contemplated by the said act.

The reason we say these amounts must be treated as donation arises out of argument of counsel for the state. They argue properly that there is no pledge of revenues for repayment. Impliedly there is not even a promise of repayment, except such as arises from the relative terms of borrowing and lending. We have already seen how this permanent school fund has been created and built up. Its preservation and purposes are explained by statutes, the pertinent parts of which are as follows:

"The State Board of Education shall have the management and investment of the permanent school fund belonging to the state, and shall invest the accumulation thereof in bonds of the United States, those of the state of Arkansas issued since the year 1874, or any political subdivision of this state, which is authorized by law to borrow money and issue bonds therefor, and which has never defaulted in the payment of principal or interest on its bonds, . . . . All securities so invested in shall be kept in the state treasury for safe-keeping subject to the order of the State Board of Education." Section 11449, Pope's Digest.

"The permanent school fund . . . shall be securely invested and sacredly preserved as a public school fund which shall be designated as the permanent school fund of the state, and which shall be the common property of the state for public school purposes only.

"The permanent school fund shall remain inviolate and intact, and the interest thereon shall be expended for the maintenance of the schools of the state." Section 11569, Pope's Digest.

Even if the foregoing statutes be deemed as repealed or modified so that act 239 of the Acts of 1937 may not be affected by the restricting or diverse provisions thereof, then the fund may not be so appropriated. See § 2 of Art. 14 of the constitution hereinbefore set out.

It is argued that the school for the blind is a part of the public school system. If this theory were correct, we do not think the conclusion necessarily follows that there is a right to so use the permanent school fund. This fund was levied and collected to form active capital for the production of additional revenue by investment in income producing securities. It would be using the funds for purposes never intended in the collection and accumulation thereof to convert them into a building fund for the erection of a non-income producing structure subject to obsolescence and decay. Even if it be a loan, as argued, there is no security for a part thereof, except the unacknowledged obligation of some future legislature to restore the fund.

We do not think the above-quoted statutes were repealed or even modified by act 239 aforesaid, nor do we think the Blind School is a component part of the common or public school system of the state. Different provisions of our organic law relate to education generally, and to the care and education of blind children particularly.

Section 1, Art. 14, of the state constitution provides that the state shall maintain a public school system. Section 19 of Art. 19 provides that the legislature shall make suitable provisions for the support of institutions for educations of the blind.

Obviously, on account of their affliction, blind children cannot be educated with those who are not blind, nor by the same methods. In order that they may be self-respecting and, in the future, self-supporting, it would seem that the blind children should be the object of the state's more generous care than those who are

not so afflicted, but even the state's generosity to its wards will not warrant the unjust deprivation of acknowledged rights belonging to another class. Citizens or property owners who by their contributions and taxes paid build such funds as the permanent school fund are properly active in defending such funds against invasion. Generous impulses, however commendable, may not serve to palliate erroneous action.

Throughout all the years the Blind School, as an entity separated from the common school system, has been supported and maintained by the state, and so far as we are advised by citations, or otherwise, in the briefs presented to us, there does not seem to have ever been a time when the Blind School had a call upon the public school funds for support or maintenance. If there was ever a time when it was intended that the Blind School should be deemed a part of the public school system that fact has not been evinced by any suitable or appropriate legislation.

We hold, therefore, that act 239 of the Acts of 1937, in so far as it attempts to appropriate or use money from the permanent school fund is ineffectual and that said fund is not available for the purposes designated in said act.

We hold, also, if the fund so appropriated be regarded as a loan that the state necessarily is obligated for the repayment of this money to the particular fund, and such implied obligation for repayment of the fund is in violation of amendment No. 20 to the state constitution.

On account of this view that we have taken in regard to the permanent school fund, it becomes unnecessary to determine whether the state might advance, upon the security offered, any particular or specified amount to be repaid upon the sale of the Blind School properties, the value of which is rather highly speculative at this time. This statement is made for reasons unnecessary to elaborate.

Our conclusion, therefore, is that the chancery court rendered an erroneous decree. It is, therefore, ordered that the decree be reversed and the cause be remanded to the chancery court, with directions to overrule the de-

murrer and for such other action as the court may deem appropriate, not inconsistent with this opinion.