COFFELT *v.* NICHOLSON.

5-613                                                     272 S. W. 2d 309

Opinion delivered November 8, 1954.

*Wayne Owen* and *Kenneth C. Coffelt,* for appellant.

*Tom Gentry,* Attorney General, and *Bailey, Warren & Bullion,* for appellee.

GRIFFIN SMITH, Chief Justice. Rosemary Coffelt appeals from the trial court's action in vacating a temporary order directing the dean and executive council of the University of Arkansas School of Medicine to accept her as a junior student. Pulaski chancery court, second division, had issued a similar order, but the action was abandoned when attorneys representing the petitioner concluded that circuit court was the appropriate forum.

The temporary order issued by Judge Amsler, therefore, was an interim action maintaining the *status quo* until the petition could be heard on its merits.

Appellant's application for admission to the School of Medicine was made in the spring of 1951. Her preparatory background included attendance at the University of New Mexico, Washington University at St. Louis, and Arkansas State Teachers College. When enrollment officials of the School of Medicine addressed each of these institutions and requested expressions regarding the applicant's qualifications for the study of medicine, Washington University held adverse views; the other two were favorable. Based, perhaps, upon determinations reached by appellant's faculty interviewer which seemingly were in accord with Washington University, admission was rejected. But in September, when a last-minute vacancy occurred, Dean Nicholson on behalf of the applicant wrote that her intelligence quotient indicated an ability to do the work required. Coupled with the Dean's conclusions was the statement that on a competitive basis the reasons formerly given for rejection would not be waived, but inasmuch as an "opening" existed and no one better qualified would be discommoded on account of this final exercise of discretion, harm could not result because no one with superior qualifications would be discriminated against.

It is conceded by appellees that Rosemary disclosed an above-the-average mentality. Dean Nicholson felt that she was capable of excellent work and that reasonable conformity to the school's rules and supervising authority would produce results that might well be approved. Her freshman year gave no indication that ability was lacking or that her disinclination to respond to faculty rules and to attend classes with satisfactory regularity would progress to a point subversive of discipline or prejudicial to scholastic aims. It may be said, therefore, that in spite of class-cutting and an inclination to disregard authority, she completed the first year's work with a record not open to criticism.

During appellant's second year class-cutting increased, with the result that instructors complained, and Dean Nicholson, in turn, remonstrated with Rosemary, who gave repeated assurances that improvement might be expected. Sophomore grades, unfortunately, did not reflect the application instructors had hoped for. In two courses — physical diagnosis and medicine — F grades were recorded, with E in parasitology. The authorities permitted Rosemary to do summer work in physical diagnosis and medicine and to repeat the course in parasitology. The examinations in physical diagnosis and medicine resulted in C grades. In parasitology the grade was D.

Taking into consideration these inferior marks and a personal attitude thought by the faculty to be wanting in cooperation, the promotions committee declined to recommend that the student be permitted to enter the junior year. It was the committee's thought that the best interests of the school, and the best interests of Rosemary would be served by a requirement that she drop back into the sophomore class and repeat the courses of that year. But Dean Nicholson, still intrigued with Rosemary's capabilities and hoping (but seemingly with reservations) that she could be made to realize the desirability of conformity and take a more reasonable attitude toward the established order, vetoed the committee's recommendations and permitted promotion with a letter of warning. The letter is copied in the footnote.[1]

It must be borne in mind that when Dean Nicholson wrote this letter he exercised a permissive prerogative of experimentation. A better expression would be that in a sincere desire to salvage an educational opportunity by exerting every reasonable recourse to promote and develop apparent intellectual qualities, the Dean was will-

---

[1] "After careful consideration I have decided to permit you to enter the junior year of the School of Medicine. As I am sure you realize, I do this somewhat reluctantly and with some misgivings as to its wisdom. I think that you should look upon the decision as a tentative one, subject to your conducting yourself in the future in accordance with the behavior customarily expected of our students. I am sure you can, if you wish, do work that is not only satisfactory, but brilliant. I hope that you will justify the confidence I have shown in you in making this decision."

ing to assume full responsibility for overriding his committee's rejection in placing the student on probation. But with this action the message was implicit that acquiescence in the school's method of instruction, class attendance, attitude toward those who lectured and explained, and earned grades, were imperative.

Thus Rosemary began her junior year contrary to the committee's best judgment, but with the Dean's unwavering belief in her capabilities.

It is the contention of appellees that the hoped-for improvement did not materialize. While in many instances attendance records were not kept, the instructors must have known—for they complained of the practice—that Rosemary's absenteeism was progressive, that she did not hesitate to express her dislike of instructors or to criticise their methods, and to disregard lectures in favor of home study. That her ability to absorb information from textbooks was superb is attested by the fact that in many instances good grades were made in subjects when class attendance had been negligible.

In February, 1954, when the first semester ended, the student was confronted with the probability of failure in four courses and with actual failure in a fifth subject. In these circumstances Dean Nicholson permitted Rosemary to withdraw without prejudice, and he later wrote Dr. John F. Sheehan, Dean of Stritch School of Medicine, Loyola University, Chicago, and to Dr. John S. Herschboeck, Dean of Marquette School of Medicine, Milwaukee, Wisconsin.

In these letters—although he dealt frankly and courteously with Rosemary's impediments from his own school's standpoint—Dean Nicholson expressed the view that her mentality was of a high order; and, irrespective of local matters influencing withdrawal from the school here, her capabilities were sufficient to justify further study in an environment not influenced by the cumulative friction that had attended her contact with some of the instructors and a portion of the student body.

With certain recommendation forms, Dean Nicholson emphasized favorable phases of Rosemary's work and capabilities. Her freshman year, he said, was thoroughly satisfactory, but scholastic deterioration occurred during the sophomore period, and friction became more acute. The letter to Dean Sheehan closed with this sentence: "Personally I would like to see her given an opportunity to show what she can do when she tries, and I would appreciate any consideration that you might accord her."

The application was rejected; and the letter to Dr. Herschboeck, was unavailing. In the fall of 1954 Rosemary applied for admission to the junior class here, her position being that the permissive withdrawal near the end of the first semester of the junior year amounted to a certificate of good standing, having the effect of erasing by forgiveness the things complained of during the sophomore year and extending into the incompleted junior period. When the committee rejected the application Dean Nicholson did not feel justified in overriding his associates a second time, and Rosemary was so notified. The chancery suit followed, as a consequence of which the student began her attendance. Avoidance of Judge Williams' writ was succeeded by Judge Amsler's temporary order, its dismissal, and this appeal.

If the situation were one involving grades alone and if the inquiry related exclusively to a rejection based upon personal dislikes, pedagogical peculiarities or whims, and the like, a different situation would be presented. There are instances where courts would take jurisdiction and, with convincing proof, resort to the extreme process of mandamus to prevent an exercise of presumed authority. No one to whom duties are delegated is empowered to do other than discharge the obligations expressly conferred or necessarily implied. Beyond this point the act consummated under official guise becomes personal and is subject to a court's restraining command.

Appellant and the appellees have called to our attention numerous court decisions which, in an appropriate case, would be persuasive. The rejected applicant's attorneys here summarize the controversy in this way:

"We say the appellant has the inherent and contractual right to continue in this school so long as she remains in good standing." The vice in this argument is that in the opinion of medical school authorities Rosemary was not in good standing. That she was permitted to withdraw from the junior course in the face of inevitable failure was, they say, an act of grace prompted by a disinclination to scholastically stigmatize one whom Dean Nicholson thought to be worthy of his tolerance and future aid. That the action taken was with inferential reservations is indicated by the executive council's rejection record of Sept. 1, 1954: "Motion carried unanimously to uphold the recommendations of the promotion committee that Miss Coffelt's request for readmission not be approved *at this time*." (Emphasis supplied)

We find nothing in the record suggestive of capricious conduct upon the part of appellees, or disregard of that high sense of duty an official owes to his employers —the public. School enrollment through mandamus is not unknown, and there are cases where the writ has issued; but in a controversy between a student upon the one hand and numerous instructors and officials upon the other, resort should be to the courts only when the petitioner's rights have been so clearly invaded as to leave no reasonable doubt in the judicial mind that an injustice has been done. Not infrequently that which seems to the student to be unreasonable as an exaction, and burdensome as prescribed conduct, embraces essential conformity without which the designed accomplishment could not be achieved.

For these and other obvious reasons courts do not interfere with administrative management except when there has been an abuse of discretion—a condition not disclosed by this record.

Appellees argue that the proceedings were premature because appellant had not exhausted her administrative remedy by petitioning the board of trustees of the University of Arkansas, who have control of the school of medicine. *Schirmer* v. *Light, Judge,* 222 Ark. 693, 262 S. W. 2d 143.

It is fundamental that jurisdiction of the subject matter cannot be conferred by consent. But where the subject matter is cognizable by a particular court, jurisdiction of the parties may be acquired by consent. *Purnell* v. *Nichol,* 173 Ark. 496, 292 S. W. 686. In the case at bar the complaint alleged and the reply admitted that the University Board had delegated admission and rejection authority to the medical school authorities, and we are not called upon to decide whether such power was properly delegated.

Affirmed.