The Honorable Bob Johnson Speaker of the House P.O. Box 173 Bigelow, AR 72016-0173
Dear Speaker Johnson:
You have requested an opinion concerning certain public school issues.
Your questions are:
 (1) Is a principal considered a teacher for purposes of the Teacher Fair Dismissal Act?
 (2) If the district's personnel policy (approved by the school board) requires that all new teachers to the district be placed on probationary status regardless of prior experience, does this policy comply with the Teacher Fair Dismissal Act?
 (3) To what extent does Article 14, § 2 of the Arkansas Constitution apply to organizations that wish to avail themselves of school property, such as classrooms, the cafeteria, the gymnasiums, and various ball fields? Would a charge equivalent to fair rental use satisfy the constitutional provision? Can these organizations use school property to earn a profit by engaging in such activities as charging admission and selling concessions? Would the school district be required to develop and implement a facilities use policy? What sanctions could be levied if a school district fails to comply with this provision?
RESPONSE
Question 1 — Is a principal considered a teacher for purposes ofthe Teacher Fair Dismissal Act?
It is my opinion that the answer to this question will depend upon the terms of each principal's employment.
The term "teacher" is defined in the Act as follows:
 "Teacher" means any person, exclusive of the superintendent or assistant superintendent, employed in an Arkansas public school district who is required to hold a teaching certificate from the Department of Education as a condition of employment.
A.C.A. § 6-17-1502(1).
Under the rules and regulations of the Arkansas Department of Education, elementary and secondary principals are not required to hold teaching certificates in order to be certified as principals. [They must either hold a teaching certificate or be "qualified to hold" a certificate. See DOE Regulations 610.00 (governing certification of administrators); 620.00 (governing certification of elementary principals); 630.00 (governing certification of secondary principals).]
Individual school districts, however, may require their principals to hold a teaching certificate as a condition of employment with the school district. Such a requirement is permissible under state law. The Arkansas courts have consistently recognized the wide latitude and discretion that is granted to school districts in establishing their own policies; the courts will not interfere with the decisions of local school boards in the absence of an abuse of discretion or a conflict with clearly enunciated restrictions of state or federal law. King v. Cochran,419 F. Supp. 54 (W.D.Ark. 1976), aff'd 551 F.2d 1133; Cato v. Collins,394 F. Supp. 629 (E.D.Ark. 1975), aff'd 539 F.2d 656; Appler v. MountainPine School Dist., 342 F. Supp. 1131 (W.D.Ark. 1972); Evans v. McKinley,234 Ark. 472, 352 S.W.2d 829 (1962); Safferstone v. Tucker, 235 Ark. 70,357 S.W.2d 3 (1962); Coffelt v. Nicholson, 224 Ark. 176, 272 S.W.2d 309
(1954); Pugsley v. Sellmeyer, 158 Ark. 247, 250 S.W.2d 538 (1923). A requirement that a principal hold a teaching certificate would not constitute an abuse of discretion, nor would it conflict with any state or federal law.
Therefore, if a school district requires its principals to hold teaching certificates as a condition of employment with the district, these principals are "teachers" within the meaning of the Teacher Fair Dismissal Act. If a school district does not impose such a requirement upon its principals as a condition of employment, the principals are not "teachers" within the meaning of the Teacher Fair Dismissal Act.
Question 2 — If the district's personnel policy (approved by the schoolboard) requires that all new teachers to the district be placed onprobationary status regardless of prior experience, does this policycomply with the Teacher Fair Dismissal Act?
It is my opinion that the personnel policy you have described does comply with the Teacher Fair Dismissal Act.
The Act addresses this issue in A.C.A. § 6-17-1502, as follows:
 "Probationary teacher" means a teacher who has not completed three (3) successive years of employment in the school district in which the teacher is currently employed. A teacher employed in a school district in this state for three (3) years shall be deemed to have completed the probationary period; however, an employing school district may, by a majority vote of its directors, provide for one (1) additional year of probationary status.
A.C.A. § 6-17-1502(a)(2) (emphasis added).
The above-quoted language of the Teacher Fair Dismissal Act explicitly allows school districts to impose a requirement of probationary status upon its teachers, regardless of prior experience. The Arkansas Supreme Court has interpreted this language in this way. In McGee v. AmorelPublic Schools, 309 Ark. 59, 827 S.W.2d 137 (1992), the court stated:
 The legislature never intended to require a school district which was considering employing a teacher who had achieved nonprobationary status in another district, to employ that teacher on a nonprobationary status. That is the very purpose behind the last clause of the second sentence in section 6-17-1502(a)(2), which allows the employing district to put the nonprobationary teacher back on probationary status for one year.
Id. at 63.
In light of this interpretation of the Act by the Arkansas Supreme Court, I must conclude that a school district may enact a personnel policy that places all newly-employed teachers on probationary status, regardless of their prior experience.
I note that if a school district requires its principals to hold a teaching certificate as a condition of employment, the principals are "teachers" within the meaning of the Act, as discussed in response to Question 1, and the probationary provisions can be applied to them.
Question 3 — To what extent does Article 14, § 2 of the ArkansasConstitution apply to organizations that wish to avail themselves ofschool property, such as classrooms, the cafeteria, the gymnasiums, andvarious ball fields? Would a charge equivalent to fair rental use satisfythe constitutional provision? Would the school district be required todevelop and implement a facilities use policy? What sanctions could belevied if a school district fails to comply with this provision?
Although it is unclear, in my opinion, whether Article 14, § 2 of the Arkansas Constitution governs money or property owned by individual school districts, it is my opinion that whether or not this constitutional provision applies, each individual local school board has the authority and responsibility to decide whether a particular use of school property is appropriate. It is clear that a school board may not authorize a use of school property under factual circumstances that would render the transaction an illegal exaction, under Article 16, § 13 of the Arkansas Constitution, nor may it do so in any other manner that would violate the law. I will explain these conclusions more fully below, discussing both the scenario in which Article 14, § 2 does not apply, and that in which it does apply. As noted previously, the result will be the same in both scenarios: the individual school district must make the decision.
I begin by setting forth Article 14, § 2. It states:
2. School fund — Use — Purposes.
 No money or property belonging to the public school fund, or to this State for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs.
Ark. Const., Art. 14, § 2.
The Result if Article 14, § 2 Does Not Apply
As explained below, it could be argued that Article 14, § 2 does not apply to money or property owned by a school district. This argument would be based upon an interpretation of the phrases "public school fund" and "money or property belonging to . . . this State," as used in Article 14, § 2.
The "Public School Fund"
Although the Arkansas Supreme Court has not directly addressed the question of what is meant by the phrase "the public school fund," as used in the above-quoted provision, it could be argued that that this phrase refers to money or property held in an account at the state or county level for the benefit of all public schools within the jurisdiction of the state or county.
Such an argument would be based upon three factors. First, the provision does not mention money or property owned by individual school districts. Rather, because the phrase is stated in the singular, it appears to refer to a common fund.
Second, when Article 14 is read as a whole, its purpose appears to have been to create a public school system, supported by public funds. The Arkansas Supreme Court has seemed to read the reference to public funding in Article 14 as being a reference to a single central source of funding, available to individual school districts. This view is reflected in an early case involving Article 14, § 2, Ruff v. Womack,174 Ark. 971, 298 S.W. 222 (1927) (interpreting Article 14 as imposing a duty upon the legislature to maintain a public school system, and finding that this duty constitutes a proper purpose for which the state may use its credit by lending to individual school districts from the state's public school fund).
Third, in the cases in which Article 14, § 2 has been invoked, the Arkansas Supreme Court has seemed to assume (without discussing the issue) that the reference to "the public school fund" was a reference to a single common fund, held either by the state or by the county for the benefit of all schools within their jurisdictions. See, e.g., MagnoliaSchool Dist. 14 v. Ark. St. Bd. of Educ., 303 Ark. 666, 799 S.W.2d 791
(1990) (funds held by state); Dermott Spl. School Dist. v. Brown,253 Ark. 222, 485 S.W.2d 204 (1972) (funds held by county); State Board ofEducation v. Aycock, 198 Ark. 640, 130 S.W.2d 6 (1939) (funds held by state); Walls v. State Board of Education, 195 Ark. 955, 116 S.W.2d 354
(1938) (funds held by state); State Ex Rel. Atty. Gen. v. State Board ofEdu., 195 Ark. 222, 112 S.W.2d 18 (1937) (funds held by state); Board ofEducation of Lonoke Cty. v. Lonoke Cty., 181 Ark. 1046, 29 S.W.2d 268
(1930) (funds held by county); Ruff v. Womack, 174 Ark. 971, 298 S.W. 222
(1927) (funds held by state); Sloan v. Blytheville Special SchoolDistrict No. 5, 169 Ark. 77, 273 S.W. 397 (1925) (funds held by state). Indeed, in Rainwater v. Haynes, 244 Ark. 1191, 428 S.W.2d 254 (1968), the Arkansas Supreme Court specifically stated that Article 14, § 2 "prohibits the use of money or property belonging to the state school fund for any other than the purpose to which it belongs." Id. at 1195 (emphasis added).
The only cases in which it has even been intimated that Article 14, § 2 could apply to money or property owned by individual school districts were not decided on the basis of that provision, but rather, on the basis of Article 14, § 3 (which prohibits the use of school tax proceeds for non-school purposes), or on statutory grounds. See, e.g., FayettevilleSchool Dist. v. Arkansas State Bd., 313 Ark. 1, 852 S.W.2d 122 (1993) (analyzing issue under Art. 14, § 3); Rainwater v. Haynes,244 Ark. 1191, 428 S.W.2d 254 (1968) (analyzing issue primarily under Art. 14, § 3); Scott V. Magazine Sp. School Dist. No. 15,173 Ark. 1077, 294 S.W. 365
(1927) (holding that school district's board had statutory authority by statute to sell school district's property).
Although it is not entirely clear whether a common school fund, held and administered by the state or the counties, existed at the time of the adoption of the Arkansas Constitution, it is clear that the current "Public School Fund," authorized by A.C.A. § 6-20-203 et seq., has a long history of predecessor funds that date at least to 1897. For a discussion of the history of the public school fund, see State Board of Educationv. Aycock, 198 Ark. 640, 130 S.W.2d 6 (1939). A common fund of this nature may have been what the drafters of Article 14, § 2 envisioned in using the phrase "public school fund."
"Money or Property Belonging To . . . This State"
There is little question that the phrase "money or property belonging to . . . this State for the benefit of schools," as used in Article 14, § 2, does not refer to money or property owned by individual school districts. First, the language of this phrase is unambiguous in that regard. Second, the Arkansas Supreme Court has explicitly recognized in other contexts that revenues of school districts are not revenues of the state. In State Ex Rel. Atty. Gen. v. State Board of Edu., 195 Ark. 222,112 S.W.2d 18 (1937), the court held that school district bonds pledged to the state as security for loans from the state public school fund were not state revenues for purposes of Amendment 20, which prohibits the pledging of any of the state's revenues. In so holding, the court stated:
 When we refer to the revenues of the state, we usually mean the annual or periodic yield of taxes, excises, customs, etc., which the state collects and receives into the treasury for public use[.] . . . It must be remembered that the bonds pledged in this case as security were bonds issued by school districts delivered to the State Board of Education as security for money obtained from the revolving loan fund. This is not, in fact, strictly a part of the state's revenues, as distinguished from school funds.
Id. at 225 (emphasis added), quoting Davis v. Phipps, 191 Ark. 298,85 S.W.2d 1020 (1935). This reasoning could apply equally to money or property owned by individual school districts, for purposes of Article 14, § 2. That is, it could well be argued that such money or property does not constitute "money or property belonging to . . . this State for the benefit of schools."
The foregoing arguments and interpretation of the language of Article 14, § 2 could support a conclusion that this provision should not be interpreted to govern money or property owned by individual school districts, but rather, to money or property held by the state or the county for the benefit of the public schools within those jurisdictions.
If such a conclusion is correct, the decision about whether a particular use of school property is appropriate is one that must be made by each individual school board, within the bounds of its statutory authority (and within all other bounds of the law). The authority of school boards is set forth in A.C.A. § 6-13-620, as follows:
 The board of directors of each school district in the state shall be charged with the following powers and perform the following duties:
 (1) Have the care and custody of the schoolhouse, grounds, and other property belonging to the district and shall keep it in good repair and in sanitary and sightly condition;
 (2) Lease sixteenth section lands located in the school district, individually or in conjunction with the other boards of directors of other school districts interested in the sixteenth section, as the case may be;
 (3) Purchase buildings or rent schoolhouses and sites therefor and sell, rent, or exchange such sites or schoolhouses. Provided that, in the selection of any school site or the erection of any schoolhouse outside of an incorporated town or city that contains two thousand five hundred (2,500) or more inhabitants, the selection or erection shall be approved by the county board of education before the contract for securing the site or contract for building the schoolhouse is made;
 (4)(A) Employ teachers and other employees necessary for the proper conduct of the public schools of the district and make written contracts with teachers and all other employees in the form prescribed by the State Board of Education.
(B) There shall be four (4) copies of each contract made:
(i) One (1) copy to be retained by the board;
(ii) One (1) copy to be given to the employee;
 (iii) One (1) copy to be forwarded to the county treasurer if the county treasurer serves as treasurer for the school district; and
 (iv) One (1) copy to be filed with the county board or the board's designee.
 (C) Relationship by any degree of affinity or consanguinity to a member of the county board of education shall in no way prejudice the employment or hiring of anyone by a school board or public school district.
 (D) The issuing of annual contracts to personnel other than substitute teachers employed on a daily basis and teachers shall be in writing and shall recite the duration of employment, specific duties, and annual salary;
 (5) See that all subjects for study prescribed by the State Board of Education or by law for all grades of schools in their district are taught;
 (6) Procure from the county board or the board's designee all forms for each teacher at the commencement of the school term, including a register and such other forms and blanks and supplies as are required by law to be furnished to the teachers;
 (7) Visit the schools frequently, see to the welfare of the pupils, encourage them in their studies, and assist the teachers in the work so far as they can;
 (8) Prepare and publish the district's budget for the ensuing year, in accordance with § 6-13-622;
 (9) Issue warrants on the county treasurer, when the county treasurer serves as treasurer of the school district, in accordance with the provisions of this act for the payment of salaries due teachers and other employees, and for any other lawful purposes, and state in the warrants the consideration for which each is drawn, provided that the issuance of the warrants for the purposes set out in subdivision (11) of this section shall be governed by the penalty therein set out. The warrant shall be in the form approved by the State Board of Education;
 (10) Obtain from the county collector and county treasurer, when the county treasurer serves as treasurer of the school district, information from time to time as to the state of finances of their school district and keep their expenditures safely within the means of the district;
 (11) Buy and pay for out of district school funds supplies such as fuel, crayons, charts, globes, dictionaries, etc., which may be necessary for the efficient operation of the schools, provided that, for schools except those in cities having two thousand five hundred (2,500) or more population, the supplies meet the approval of the county board or the board's designee in price and merit, and provided further that no warrants shall be issued by any school board for the payment of the supplies or services set out in this subdivision until the supplies or services shall have been delivered to the school. If any school board or any part of the directors of any school board in the State of Arkansas shall issue warrants in payment of supplies or services prior to the delivery of the supplies or services to the school and the school district suffers any loss because of the failure of the seller to deliver the supplies or services or because of the defective quality of the supplies or services or for any other reason, then the directors shall be personally liable to the school district for the total amount of loss suffered by the district;
 (12)(A) If in any school district it should be apparent that the schools cannot be operated for the remainder of the school year without incurring more indebtedness than that represented by outstanding bonds and those that may be issued for buildings, equipment for the school buildings, purchasing sites, and repairing school buildings, or the improvement of sites, it shall be the duty of the school district board of directors to close the school and cease paying the teachers for the remainder of that fiscal year. Each contract made with the teachers shall be subject to that contingency, and the district shall not be liable for teachers' salaries for the time the school is so closed.
 (B) Should any director participate in keeping a school open and incurring additional expenses which would cause increased indebtedness of the district herein prohibited, he shall be liable personally for the amount of such additional indebtedness.
 (C) However, in cases of emergency, the State Board of Education may grant special permission to a district to create temporary current indebtedness.
 (D) Nothing herein shall prevent any school district board of directors from borrowing money from banks, individuals, or from next year's revenue in order to provide funds in such amount that the maximum nonbonded indebtedness of their school district so incurred shall not be greater than the maximum nonbonded indebtedness of such district was at any time during the preceding fiscal year.
 (E) If any nonbonded debt is funded by the issuance of bonds, the amount so funded shall not be considered in determining the maximum amount of nonbonded indebtedness during the preceding fiscal year; and
 (13) Do all other things necessary and lawful for the conduct of efficient free public schools in the district.
A.C.A. § 6-13-620.
In addition to the above-enumerated powers, school boards are given the explicit statutory authority to allow school property to be used for community purposes. This authority is granted in A.C.A. § 6-21-101, as follows:
 The directors of any school district may permit the use of the public schoolhouse for social, civic, and recreation purposes or any other community purpose, including any lawful meetings of its citizens, provided such meetings do not interfere with the regular school work, and the directors may make a charge therefor if they deem it proper to do so.
A.C.A. § 6-21-101.
The above-cited statutory grants of authority appear to impose upon school districts the limitation that their decisions have a purpose that is lawful and consistent with the efficient operation of the school.
This guiding principle is consistent with the hands-off approach that the Arkansas Supreme Court has taken with regard to internal school district policies. As noted previously in response to Question 1, school districts are given wide discretion in the determination of their own policies, and the courts will not interfere with the decisions of local school boards in the absence of an abuse of discretion or a conflict with clearly enunciated restrictions of state or federal law.
The Result if Article 14, § 2 Does Apply
It is my opinion that even if Article 14, § 2 does apply to money and property owned by individual school districts, the result should be the same. That is, even if Article 14, § 2 does apply, individual school boards have the authority and responsibility to decide whether a particular use of school property constitutes a "purpose to which [the money or property] belongs," within the meaning of Article 14, § 2. The guideline that the school boards must follow in making this determination should, in my opinion, be the same that the school board would follow in the absence of Article 14, § 2. That is, the board's primary consideration should be whether the use in question is lawful and is consistent with the efficient operation of the school. As noted previously, this guideline arises out of the statutory statements of the board's authority. It is also, in my opinion, an appropriate basis for the interpretation of the meaning of the phrase "the purpose to which it belongs," as used in Article 14, § 2.
In short, it is my opinion that whether or not Article 14, § 2 applies, a school board can allow non-school organizations to use school property such as classrooms, the cafeteria, the gymnasiums, and various ball fields, if, in the judgment of the school board, that organization's use of the property is lawful and is consistent with the efficient operation of the school. In this regard, I must note that the board will be constrained by constitutional requirements such as the prohibition against illegal exactions. See Ark. Const., Art. 16, § 13. For this reason, it may be appropriate, depending upon the circumstances, for the board to impose a charge for the use of school property. It would be advisable for the school board to develop and implement a facilities use policy.
If a determination were made by a court that Article 14, § 2 does apply to money or property owned by a school district, and that a particular school district was in violation of the requirements of this provision, various remedies would be available for the correction of this deficiency. The particular remedy that is available in such circumstances will depend entirely upon the facts of the case, the specific failure of the school district, and the particular damage that has been suffered. Among the remedies that may be available, depending upon the circumstances, are a writ of mandamus or an illegal exaction action. The particular type of action taken may also be a strategic choice. For this reason, private counsel should be consulted regarding this issue.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:SA/cyh