STATE *ex rel.* SHERMAN *v.* HYMAN *et al.*

STATE *ex rel.* AVAKIAN *v.* SAME.

(*Nashville*, December Term, 1941.)

Opinion filed December 5, 1942.*

---

*Designated for publication May 29, 1943.

100

NAT TIPTON, Assistant Attorney-General, JOHN HEISKELL, Assistant Attorney-General, and WASSELL RANDOLPH, of Memphis, for the appellant.

SHEPHERD, OWEN & HEISKELL, of Memphis, for appellee.

MR. JUSTICE NEIL delivered the opinion of the Court.

The appellees in these causes were expelled from the medical department of the University of Tennessee upon

the charge of having sold final examination questions to their fellow students. They filed their separate original bills in the Chancery Court of Shelby County against O. W. Hyman, Dean of the University of Tennessee College of Medicine, James D. Hoskins, President of the University of Tennessee, and others who are members of the Executive Committee of the University of Tennessee College of Medicine, also others who are named as members of the special committee of the Board of Trustees of the University of Tennessee, praying that the alternative writ of *mandamus* issue to compel the defendants to reinstate them immediately and to certify to each of them the credits received, without derogatory statement and without mention of the ''unlawful, illegal expulsion,'' or ''to show cause why they have not done so.'' Since the issues are the same in both cases, they were tried together by the Chancellor, without objection, and a separate decree entered.

It is alleged that the University of Tennessee is a public educational institution of the State of Tennessee, supported by state funds, and that it is maintained and operated for the special benefit of citizens of this State. It is further alleged that relator was admitted to the College of Medicine of the University, his qualifications for admission being in all respects satisfactory to the school authorities; that the acceptance of relator as a student was a contract by implication, under which he has the right to continue his studies until he has completed his education entitling him to practice his profession in the State of Tennessee. It is admitted in the bill that the defendants had the authority to expel relator for violating the rules of conduct established by the University, but only after relator was found guilty of charges

preferred on a full, fair and complete hearing. Each of the relators aver that they had studied for two years in the College of Medicine, and, while they were "laying out for a quarter" in accordance with the rules of the school, they were expelled upon false charges of having sold examination papers to fellow students; that they were not given a fair hearing or any hearing at all, and were deprived of the right to make proper defense against false accusations. It is further alleged that there was no proper notice given of the charge against them and that there was no opportunity given them to face their accusers or to cross-examine them.

It would unnecessarily prolong this opinion to state all the averments in the bill as to what occurred leading up to the final action of the Executive Committee in expelling relator from school. It is claimed that everything that was done was unlawful and that relator is deprived of valuable rights in that he is deprived of the right to pursue the vocation of his choice. It is averred that "the officials herein named having refused to give relator a hearing required by law, and having refused to reinstate relator, he is now entitled to have a writ of *mandamus* issue."

The alternative writ of *mandamus* issued on April 21, 1942. Thereupon the defendants appeared and made return to the bills filed by relators. Respondents aver that in their several capacities they are charged with the supervision of the medical department of the University of Tennessee; that the practice of medicine is affected with the public interest to a high degree, and that the preparation for engaging in the practice is a matter likewise affecting the public interest; that it is their duty to so supervise the study of medicine as to maintain the

highest standards of integrity and efficiency in the school, in keeping with requirements of accredited schools giving medical training; that the stealing and sale of examination questions "was of such momentous import to the good name of the school and of the medical profession generally that it warranted a searching investigation and disciplinary action to the end that the evil complained of be corrected."

It is further averred that in August, 1940, the attention of the Executive Authorities was directed to the fact that examination questions were being stolen and some of them at least sold and that they were confronted with many administrative difficulties in making a proper investigation; that being fully aware of their difficulties, the respondents organized a student council which should have primary jurisdiction of such investigations and should report its recommendations to the faculty. The Dean of the College of Medicine was a member of this student council, in addition to the twelve students composing said council. During the progress of this investigation testimony was elicited involving a number of students, among whom were these relators; that the relators were called before the council and were advised that it was in possession of evidence connecting them with the alleged theft and sale of examination questions. The relators denied their guilt and claimed to have no knowledge of the guilt of anyone. The council demanded full cooperation of all students and warned everyone that a failure to thus cooperate in the investigation would result in a recommendation for their dismissal from school. The student council after hearing the testimony against relators recommended their dismissal. They were notified by the Dean to meet with the faculty or

Executive Committee on a day certain. Relator Sherman refused to attend this meeting because of business engagements. The faculty committee, following the recommendation of the student council, expelled relators Sherman and Avakian. Some time later the relator Sherman made a request for a rehearing, which was granted on January 8, 1941, and at this meeting the President of the University, Dr. Hoskins, was present. It is averred that at this meeting the relator had read to him the substance of the testimony against him and was permitted to be heard in his own behalf and did deny having any connection with the transaction. The same procedure was had in the case of Avakian. Later the President of the University appointed a special committee from the Board of Trustees of the University to hear an appeal from the relators. This committee met in Memphis on September 30, 1941, and was presented with the substance of the testimony heard by the Dean and the student council. The relators were represented by counsel and were permitted to testify and introduce witnesses to rebut the previous findings and conclusions of the Executive Committee. After hearing the transcript of the testimony against relators read and after hearing them both in person and by counsel, the committee of the Board of Trustees voted to affirm the action of the faculty Executive Committee and concur in the expulsion of relators.

It is further averred, "While it is true that relator was not confronted face to face with the witnesses who accused him, and was not permitted to cross-examine them he was at all times aware of the nature of the charges against him." It is also averred, "These respondents deny that the relator, under the circumstances, was entitled to a trial in the form provided by the common

law, but on the contrary they aver that the various tribunals before whom relator was heard were more in the nature of administrative bodies whose duty it was to undertake to reach a correct conclusion from all the facts at their command.''

A number of exhibits are filed with both the original bills and the return of the respondents. The respondents have appealed from the decree of the Chancellor in directing the issuance of the alternative writ of mandamus and have assigned it as error. While the question is made by respondents that *mandamus* is not the proper remedy in the instant case, we think it proper to waive this question aside and consider whether these relators were given a lawful hearing and a reasonable opportunity to make defense against the charges preferred against them.

Since these causes were heard upon bill and answer, the facts alleged therein, as well as all exhibits, must be considered as true, not as to the guilt or innocence of the relators, but as to the nature of the hearing accorded them. In *State ex rel.* v. *Williams,* 110 Tenn., 549, 577, 75 S. W., 948, 954, 64 L. R. A., 418, the Court said: ''It results that we must treat every averment of fact in the answer, for the purposes of the present hearing, as true, and, after consideration thereof, either grant or deny the peremptory writ.''

Passing now to the consideration of the nature and circumstances of the hearing, first, there is no doubt as to the theft and sale of examination questions and that as result thereof the faculty of the College of Medicine was confronted with a deplorable situation. That it was the plain duty of the dean to discover the culprits and expel them, cannot be denied. We furthermore find from the record that the respondents made an honest and resolute

effort to do so. Secondly, it appears that a student counsel was set up with Dean Hyman as a member and acting secretary, whose duty it was to hear testimony and make recommendations for disciplinary action by the faculty Executive Committee. This council decided that only those students who had sold, or offered for sale, the examination questions would be recommended for dismissal. A large number of students appeared voluntarily and testified before the committee. It was stated to every one that if he did not cooperate dismissal would be recommended. Some of them were granted immunity. It further appears that the relators were never confronted with any witness accusing them. We find, however, that witnesses appeared and gave evidence against them to the effect that they had sold and offered for sale certain examination questions. It does not appear that the names of any of the informers against relators were at any time given them. These relators appeared before the student council and made denial of all accusations. We think the record shows that they had sufficient notice of the charges against them. The respondent Hyman wrote a letter to the relator Sherman advising him of the charges and requested him to appear before the committee. He was requested to appear before the faculty Executive Committee the day following his appearance before the student council, but he refused to do so. When the relators went before the special committee of the Board of Trustees at a later date, to which tribunal they had appealed, they were again notified that they were charged with selling and offering for sale certain examination questions. No accusing witness however appeared, either before the faculty Executive Committee or the special committee appointed to hear relators' appeal.

Respondent Hyman merely stated to each of said committees the substance of the testimony that had been offered against them. The record discloses that some of the testimony heard by the student council was based on rumors. When these relators went before the special committee, composed of members of the Board of Trustees, Dean Hyman again stated the substance of the testimony against them. Counsel demanded the presence of the accusing witnesses and the right to cross-examine them, as well as direct and specific charges, which were denied except as to the charges.

Upon the foregoing statement of facts as to the nature and circumstances of the trial, we are confronted with the question, first, was it such a hearing as meets the requirements of justice, both to the school and these relators? and, second, were they given a fair and reasonable opportunity to make their defense?

We are not unmindful of the fact that the governing authority in both public and private schools should have and does have the widest discretion in the matter of discipline, to the end that the honor and integrity of the school, as well as its scholastic standards, be preserved and maintained. The authority should, however, recognize its responsibility to students whose honor and future destiny is within its keeping. We cannot agree with the contention of counsel for the relators that a fair hearing contemplates a trial as in a Chancery Court or court of law. *State* v. *Clapp*, 81 Mont., 200, 263 P., 433, 436. We concur in the rule laid down by the Court in *Koblitz* v. *Western Reserve University*, 21 Ohio Cir. Ct. R., 144, as follows:

"Custom, again, has established a rule. That rule is so uniform that it has become a rule of law; and, if the

plaintiff had a contract with the university, he agreed to abide by that rule of law, and that rule of law is this: That in determining whether a student has been guilty of improper conduct that will tend to demoralize the school, it is not necessary that the professors should go through the formality of a trial. They should give the student whose conduct is being investigated, every fair opportunity of showing his innocence. They should be careful in receiving evidence against him; they should weigh it; determine whether it comes from a source freighted with prejudice; determine the likelihood, by all surrounding circumstances, as to who is right, and then act upon it as jurors, with calmness, consideration and fair minds. When they have done this and reached a conclusion, they have done all that the law requires of them to do.''

In the above case [81 Mont., 200, 263 P., 437] the Court repudiated the rule laid down in *Commonwealth ex rel. Hill* v. *McCauley*, 3 Pa. Co. Ct. R., 77, stating that it ''would lead to a wholly impractical and unworkable situation'' holding that where the student was called before the dean's committee and informed of the charges against her, and making no denial after an opportunity thus to make defense, that this was a sufficient hearing.

██ It cannot be denied that the governing authority of the College of Medicine had the inherent right to expel students for acts which are contrary to good morals, which tend to lower the students of the school in any respect, and such authority will not be required to follow technical rules of procedure in bringing to trial students who have committed an offense against the institution. We think the student should be informed as to the nature of the charges, as well as the names of at least the prin-

cipal witnesses against him when requested, and given a fair opportunity to make his defense. He cannot claim the privilege of cross-examination as a matter of right. The testimony against him may be oral or written, not necessarily under oath, but he should be advised as to its nature, as well as the persons who have accused him. Students should not be compelled to give evidence incriminating themselves or which might be regarded as detrimental to the best interests of the school. Every governing authority should impress upon all students their duty to protect the honor and integrity of the school. As to the right to meet his accusers face to face in an investigation of wrongdoing, we cannot fail to note that honorable students do not like to be known as snoopers and informers against their fellows, that it is most unpleasant even when it becomes a duty. In these circumstances they should not be subjected to a cross-examination and, as is often seen in a trial court, to their displeasure if not their public humiliation. It would be subversive of the best interests of the school, as well as harmful to the community.

Counsel for relators earnestly insist that the proceedings against them were in the nature of a Star Chamber trial; that a property right was taken from them without due process of law. We think it was far from being a Star Chamber trial. Every student in the College of Medicine knew about the nature of the investigation, to-wit, the sale of examination questions. All were urged to cooperate. Everyone whose name was in any way connected with this despicable transaction was given an opportunity to appear before the student council and testify. The answer of respondents, along with various exhibits, shows that the student council, the faculty committee, and

the special committee of the Board were in nowise acting contumaciously.

▇ Conceding that the right to study medicine and practice medicine is a property right, we hold that it is a qualified right. One who claims a right cannot exercise it to the prejudice and injury of others and especially organized society. The due process clause of the Constitution, and authorities cited by counsel, can have no application where the governing board of a school is rightfully exercising its inherent authority to discipline students. When acting rightfully it does not proceed to enforce any rule of conduct arbitrarily and summarily. All the authorities agree that students may not be dismissed or suspended or deprived of any right without notice and a fair hearing. Cases cited where administrative boards have acted without authority or exceeded their jurisdiction have no application to the instant case, except as to the proper remedy to be pursued. In the case of relator Sherman, he was notified to appear before the faculty Executive Committee on a certain day. The answer shows, and it is not denied, that he not only failed to avail himself of the opportunity, but refused for business reasons. The action of Sherman clearly showed an unwillingness to cooperate with the school in the investigation. It appears that other students did appear before the faculty on the day relator was requested to appear. The substance of the evidence against them was stated and they made defense. Relator Avakian appeared before the student council and denied all knowledge of stolen questions. One witness testified that this relator offered to sell him certain questions and his description of one of the questions clearly showed that it was one that had been stolen. When called before the

faculty committee, he denied the testimony of this witness. It appears that the faculty deferred taking any action against him at that time and delayed action until they procured additional evidence. Later on a witness, Edwards, who was a former student and classmate of relator, stated to Dean Hyman in the latter's office that Avakian offered to sell him questions. The relator was fully acquainted with this testimony. He was given an opportunity to again make defense, to deny and disprove this charge.

All of the foregoing has been cited, not to show the guilt of these relators, but to point out the nature of the hearing that was accorded them. When they appealed to the special committee of the Board of Trustees, it was then that counsel made formal request to see the witnesses and the right to cross-examine them, also the nature of the charges. Dr. Hyman stated the substance of the evidence against the relators and we may assume that he stated it fairly. That it amounted to more than rumors or hearsay, cannot be doubted. The relators testified and denied their guilt. They offered other proof as to their good character. Evidently this committee, composed of distinguished members of the Board of Trustees of the University, were of opinion that the relators had been accorded a fair hearing, since their appeal was denied. They must have given the matter the most serious and thoughtful consideration, as they deferred action until some time thereafter. We think the hearing met the requirements of the law. It is supported by many decisions, all of which need not be cited. *Koblitz* v. *Western Reserve University supra*; *State ex rel.* v. *Clapp*, 81 Mont., 200, 263 P., 433; *Vermillion* v. *State*, 78 Neb., 107, 110 N. W., 736, 15 Ann. Cas., 401; *Smith* v. *Board of*

*Education,* 182 Ill. App., 342, 346, 347; *Morrison* v. *Lawrence,* 181 Mass., 326, 63 N. E., 400.

Counsel have urged that *State Board* v. *Friedman,* 150 Tenn., 152, 171, 263 S. W., 75, is in point and controlling. We think not, since the Court held that the action of the Board was void for a failure to follow statutory provisions, citing *Hawkins* v. *Kercheval,* 78 Tenn., 535. The Court further held (150 Tenn. at page 168, 263 S. W. at page 79) that a license to practice medicine is not a vested right.

We find no fault with the contention of relators that in all proceedings in courts of law witnesses must be sworn. But this is not a proceeding in a court of law, and furthermore would not be reversible error if it does not affirmatively appear to have influenced the decision. The case of *Commonwealth ex rel.* v. *McCauley, supra,* is not in accord with the weight of authority, and we do not choose to follow it. The case of *Cross* v. *Board of Trustees, etc.,* 121 Ky., 469, 89 S. W., 506, is not in point because it was alleged the Board acted arbitrarily and maliciously. In *Baltimore University* v. *Colton,* 98 Md., 623, 57 A., 14, 64 L. R. A., 108, the student was not offered any trial or hearing for alleged misconduct.

We find it to be the unanimous holding of the authorities that the courts will not interfere with the discretion of school officials in matters affecting discipline of students unless there is a manifest abuse of discretion or where their action has been arbitrary or unlawful.

For the reasons stated, we are constrained to disagree with the learned Chancellor. The causes are reversed and the respective bills dismissed.