211 So.2d 489

**Frederick P. MUSTELL**

v.

**Dr. Frank A. ROSE et al.**

**6 Div. 412.**

Supreme Court of Alabama.

June 6, 1968.

Robt. C. Barnett, Birmingham, for appellant.

Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, for appellees.

MERRILL, Justice.

Appellant filed a bill of complaint seeking a mandatory injunction to require appellees to reinstate him as a student in the Medical College of the University of Alabama, to promote him to the senior class, and to change his grades in the courses of medicine and surgery from failure to passing. The trial court denied relief.

The original bill of complaint was amended, a plea in abatement and demurrers were overruled, and at a pretrial hearing on March 29, 1966, the issue to be tried was agreed upon and was stated by the court at the beginning of the trial on April 25, 1966:

"* * * A pre-trial of this cause was held on the 29th day of March, 1966, the purpose of which of course was delineation of the issues involved in this case. And by consent of counsel on both sides, and through clear understanding, the sole issue involved in this case has been fixed, and the only valid, legal issue posed by the pleading is whether or not the Junior Promotion Committee of the Medical College of the University of Alabama, acting through its agents or employees or professors, arbitrarily and capriciously conspired, to effect the dismissal of the complainant, Frederick P. Mustell, the complainant from the Medical College, and as part of said conspiracy altered or otherwise changed the complainant's grades as earned by him or entered on his record in medical school in his junior year without just cause and in bad faith. I have requested that counsel confine their questions to that particular issue. There is an issue which might be posed by pleadings, and proof in this cause, having to do with possible punitive damages. I have reserved my ruling on the question whether they would adhere in this case. And I think now that we are ready, gentlemen, is there any objection on the part of counsel to the statement made by the Court?

"MR. BARNETT: The complainant has no objections.

"MR. THOMAS: No objection."

Testimony was taken for three days and on May 9, 1966, the court entered an interim decree, the latter part of which reads:

"In view of the fact that Dr. Champ Lyons, Chairman of the said Committee and Chairman of the School of Surgery at that time, was deceased at the time of the trial of this cause and his testimony was not available, and in view of the fact that one or more of the regularly appointed members of said Committee were not personally present at said meeting to vote on promotions and dismissals and in view of the fact that this cause presents, from a consideration of all the evidence, a case of extreme hardship upon Complainant, the Court is of the opinion that as many of the instructors and professors of the Junior Promotions Committee as may be presently alive and connected with the Medical College of the University of Alabama should hold another meeting of said Committee for the purpose of reviewing the decision handed down by said Committee and involving the passing or failure, the retention or dismissal or any other matter affecting Complainant in his academic status with the said Medical College which they might desire to consider and deliver whatever recommendations they may desire to make to this Court in writing.

"Therefore, it is CONSIDERED, ORDERED, ADJUDGED and DECREED as follows:

"ONE: That as many of the regularly constituted members of the Junior Promotions Committee who were in that status on May 28, 1964, as are presently alive and connected with the Medical College of Alabama shall hold a meeting, forthwith, and review the record of Complainant and the previous activities and meetings of the said Junior

Promotions Committee and deliver the recommendations of said Junior Promotions Committee immediately thereafter to this Court for its consideration in arriving at a final decree in this cause.

"TWO: The Court expressly reserves this cause for future orders."

The second decision sought by the interim decree (court's Exhibit A, referred to in the final decree) is not made a part of this record. It is obvious that it was before the trial court and counsel for the parties knew what it contained.

Then, on May 25, 1966, the court entered the following final decree:

"On May 9, 1966, this Court issued an 'Interim Decree' which called for a review by the Junior Promotions Committee of the academic record of Complainant in the Medical College of the University of Alabama with recommendations of the said Committee. On May 24, 1966, the said Committee submitted to the Court (see Court's Exhibit B) its written report of a review of Complainant's record in the Medical College of the University of Alabama, with their recommendations, and all approved by the Dean of the Medical College. Counsel for Respondents submitted said report to the Court along with a forwarding letter (Court's Exhibit A).

"As indicated in said 'Interim Decree' of May 9, 1966, 'the gist of the Complainant's alleged cause of action is the alleged altering or changing of certain of the recorded grades of Complainant for his academic Junior year in the Medical College of the University of Alabama, arbitrarily or capriciously and without just cause and in bad faith'. By amendment, at the close of oral hearing, Complainant further alleged that 'had his true and rightful grades earned by him in Surgery during his Junior year in the Medical College of Alabama been submitted to the Junior Promotions Committee on May 28, 1964, that said Junior Promotions Committee would not have recommended that he be dismissed

as a medical student in the Medical College of Alabama'.

"The Bulletin of the Medical School of the University of Alabama is in evidence in this cause. Among its provisions are the following: 'recommendations to the Dean for actions affecting the promotion or dismissal of students will rest with the respective Freshman, Sophomore, Junior or Senior Promotions Committee'; and further 'the Action of the Promotions Committee will be governed by the following principles:

"(1) Students who have received no grade less than C shall be considered as eligible to promotion to the next higher class. Second year students are required to take Part I of National Board of Medical Examination to be promoted to third year standing.

"(2) It is required that fourth year students take and pass Part II of the National Board of Examiners Examination to qualify for graduation.

"(3) The faculty reserves the right to refuse to promote or graduate any student who in the opinion of the faculty is not considered qualified for any just reason for the practice of medicine.

"(4) It should be emphasized that recommendations for promotions or dismissals are the action of Committees and not individuals'.

"This Court rules that the student and the Medical College of the University of Alabama are bound by the statements and representations made in the Bulletin as set out above.

"The evidence in this cause was lengthy and it reveals a carefully planned system of continuous checks on the performance of all students by the personnel, staff, committees and the administrative officers of the Medical College. Several tentative grades are entered in the record of the individual student, but the final grade is determined only by the department heads,

after a general survey by them of the student's total knowledge and performance in that department.

"The evidence further reveals, in the Court's opinion, that the attitude of the heads of the departments and the Dean of the Medical School and those who had the responsibility of final decision regarding the scholastic destiny of the student was uniformly beneficent and manifested a desire on the part of these persons to aid this student in his scholastic endeavors. In the Court's opinion, there is no evidence of discrimination or unfairness in these dealings with this Complainant. After Complainant's dismissal, letters written by the Dean of the Medical College to one or more other Medical Colleges where Complainant was seeking admission reflect a desire to help Complainant.

"From the evidence, to the satisfaction of the Court, it further appears that there was no conspiracy of any kind against this Complainant by any of the Respondents. The ultimate decisions regarding Complainant's scholastic progress came as a composite calculation of all elements of Complainant's performance and knowledge. The use and purpose of grades was to afford general information regarding some, but not all, of the factors involved in the student's performance.

"The following question arises in the mind of the Court and is helpful toward a decision of this cause: Do the scholastic heads, in charge of the course of study of a medical student in the Medical College of the University of Alabama, have the power to determine, from an overall consideration of a student's knowledge and performance, (including his grades), his ultimate fitness to practice medicine, and to dismiss him as a student if, in their professional opinion, in fairness and without bias, the overall knowledge and performance of the student warrants dismissal? The Court must answer this question in the affirmative.

"Accordingly, it is CONSIDERED, ORDERED, ADJUDGED and DECREED as follows:

"ONE: That the actions of the Junior Promotions Committee and the other officials of the Medical College of the University of Alabama, including all the Respondents in this cause, which resulted in the ultimate dismissal of Complainant from said Medical College were not arbitrary, capricious, without just cause or in bad faith, and, further that had the alleged 'true and rightful grades' earned by him in certain courses during his Junior year in the said Medical College been presented to the Junior Promotions Committee on May 28, 1964, the ultimate result would have been the same, namely; Complainant's dismissal from said Medical College.

"TWO: That the relief requested by Complainant in his Bill of Complaint as amended is denied.

"THREE: Costs of Court in this cause are taxed to Complainant, for which let execution issue.

"Done and Ordered this 25th day of May, 1966.

"Wm. C. Barber
"CIRCUIT JUDGE IN EQUITY SITTING"

 We quote and approve the following excerpts from Connelly v. University of Vermont and State Agr. College, D.C., 244 F.Supp. 156:

"Where a medical student has been dismissed for a failure to attain a proper standard of scholarship, two questions may be involved; the first is, was the student in fact delinquent in his studies or unfit for the practice of medicine? The second question is, were the school authorities motivated by malice or bad faith in dismissing the student, or did they act arbitrarily or capriciously? In general, the first question is not a

matter for judicial review. However, a student dismissal motivated by bad faith, arbitrariness or capriciousness may be actionable.

\* \* \* \* \* \*

"This rule has been stated in a variety of ways by a number of courts. It has been said that courts do not interfere with the management of a school's internal affairs unless 'there has been a manifest abuse of discretion or where [the school officials'] action has been arbitrary or unlawful,' State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822, cert.den. 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703 (1942), or unless the school authorities have acted 'arbitrarily or capriciously', Frank v. Marquette University, 209 Wis. 372, 245 N.W. 125 (1932), or unless they have abused their discretion, Coffelt v. Nicholson, 224 Ark. 176, 272 S.W.2d 309 (1954), People ex rel. Bluett v. Board of Trustees of University of Illinois, 10 Ill.App.2d 207, 134 N.E.2d 635, 58 A.L.R.2d 899 (1956), or acted in 'bad faith', Barnard v. Inhabitants of Shelburne, supra, 216 Mass. 19, 102 N.E. 1095, and see 222 Mass. 76, 109 N.E. 818 (same case).

"The effect of these decisions is to give the school authorities absolute discretion in determining whether a student has been delinquent in his studies, and to place the burden on the student of showing that his dismissal was motivated by arbitrariness, capriciousness or bad faith. The reason for this rule is that in matters of scholarship, the school authorities are uniquely qualified by training and experience to judge the qualifications of a student, and efficiency of instruction depends in no small degree upon the school faculty's freedom from interference from other noneducational tribunals. It is only when the school authorities abuse this discretion that a court may interfere with their decision to dismiss a student.

\* \* \* \* \* \*

"The rule of judicial nonintervention in scholastic affairs is particularly applicable in the case of a medical school. A medical school must be the judge of the qualifications of its students to be granted a degree; Courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine. People ex rel. Pacella v. Bennett Medical College, 205 Ill.App. 324. \* \* \*"

The instant case would not properly have been before the trial court or this court on appeal except for the appellant's allegations (1) that "prior to the Junior Promotions Committee meeting on March 5, 1964, that the respondents Dr. William B. Frommeyer and Dr. Buris R. Boshell arbitrarily and capriciously changed the grades earned by the complainant in his course of Medicine during his junior year without just cause and in bad faith."; (2) "that Dr. Champ Lyons, as a member of the Junior Promotions Committee arbitrarily and capriciously altered or otherwise changed the complainants grade as earned by him in Surgery from that of an 81.5 or a B, to that of a 65 or F, without just cause and in bad faith."; and (3) "that the Junior Promotions Committee of the Medical College of the University of Alabama, acting through its agents, employees and professors, arbitrarily and capriciously changed the complainants grades as earned by him and entered on his record in the medical college of Alabama in his Junior year without just cause and bad faith in the course of Medicine and Surgery."

Appellant states in brief: "Any discretionary act of the Junior Promotions Committee as a whole is not an issue on this appeal. We are only concerned with the arbitrary and capricious acts of Dr. Champ Lyons and Dr. Frommeyer in arbitrarily and capriciously changing the

Complainant's grades in Surgery and Medicine. These arbitrary and capricious acts ultimately led to the decision of the Junior Promotions Committee to dismiss the Complainant."

Appellant, thirty-eight years of age at the time of trial, was admitted to the Medical College as a freshman in September, 1961. He was promoted successively to the sophomore and junior classes. It appeared to be the custom and unwritten policy that, generally, a student who failed only one course was permitted to repeat it, but a student who failed two courses the same year was dismissed from the college. Appellant's final official grades in the third year class, 1963–64, were Medicine F, Surgery F, Preventive Medicine & Public Health B, Pediatrics C, and Psychiatry B. He received these grades by mail in June, but a letter dated May 29, 1964, the day after the meeting of the Junior Committee on Promotions, was sent to and received by him, which reads:

"The Committee on Promotions has carefully considered your academic progress, and regrets that your academic performance has been so poor. In view of the number of failing grades you have incurred, a decision to terminate your attendance at the Medical College was made.

"Your inability to meet those requirements would indicate that you are not in the proper field of endeavor."

This letter was written pursuant to the recommendations of the Promotions Committee to Dean Hill. This committee met on the afternoon of May 28, 1964. Those present were Dr. Champ Lyons, Chairman of the Junior Promotions Committee and Head of the Department of Surgery; Dr. Herschel Bentley, Jr., Head of the Department of Pediatrics; Dr. W. N. Jones, Chairman of the Department of Obstetrics and Gynecology; Dr. Jorge Lazarte, representing the Department of Psychiatry; Dr. Glenn Baird of the Department of Pre-

ventive Medicine and Public Health; Dr. Basil Hirschowitz, representing the Department of Medicine; Dr. Margaret Klapper, Assistant Dean of the Medical College; Dr. S. Richardson Hill, Dean of the Medical College; and Miss Virginia Baxley, Registrar of the Medical College. Dr. Lazarte was substituting for Dr. James N. Sussex, Chairman of the Department of Psychiatry, and Dr. Hirschowitz was substituting for Dr. Walter B. Frommeyer, Chairman of the Department of Medicine. As a result of this meeting, appellant and two other junior students were notified that they had been dismissed from the Medical College.

In view of the fact that we are affirming the decree of the trial court, we do not cover the full testimony, but only that which justifies the conclusion reached by the trial court.

### Grade in Medicine.

Many witnesses testified on this subject but we will not devote much space to it. It appears that appellant apparently concedes that he failed the course because his brief states: "We submit that he (appellant) had passed his courses with the possible exception of Medicine, but was entitled to repeat that course."

Dr. Murdaugh, one of the instructors in Medicine, in discussing appellant with Dr. Meador, another instructor in Medicine, accused appellant of "intellectual dishonesty" which was defined by the instructor as "a fabrication of information in medicine, this carries the connotation of patient neglect. It carries the connotation of great danger in medicine in the care of a sick person. Giving wrong information when asked a direct question." His inability to say "I don't know" was repeatedly exhibited. One notation by another instructor on his record called him a "bluffer." Another instructor wrote that he "Seems disorganized and tries to make up for it pure bull." These last three notations appear on appellant's exhibits, some

of which contain laudatory statements concerning him and his work.

It is interesting to note on the allegations of conspiracy that neither Dr. Frommeyer, Chairman of the Department of Medicine, nor Dr. Boshell, head of the third year in Medicine, had ever heard of the charge of "intellectual dishonesty" until the trial. Appellant was repeatedly warned about his "poor performance" but his grades in medicine continued to fall, and at the end of the winter quarter, it was proposed that appellant be given a special examination by Drs. Frommeyer and Boshell. They assigned appellant to a patient and he made several mistakes in the diagnosis, some of which were serious. Dr. Boshell signed a statement giving a record of their examination of appellant and stated: "It is the opinion of Dr. Frommeyer and myself that this student does not know enough facts to pass third year medicine. In addition, he makes a very grave error of stating things very strongly *as fact* that are not true and does not seem to realize that such is the case. It is therefore our opinion that he should be failed in the third year medicine course."

Appellant was notified on March 6, 1964, by letter, that he had failed the third year course in medicine and the next meeting of the Promotions Committee would decide whether he would be permitted to repeat the course in the summer of 1964. On May 11, 1964, appellant left a note with the registrar asking help to be allowed to repeat medicine at the University of California Medical School.

Appellant's chief contention is that an average of certain grades he had received would show that he passed medicine. The testimony of Dr. Boshell is conclusive that these are tentative grades. Then, it was Dr. Boshell's duty to call a session to review the student's performance and then a grade was turned in to Dr. Frommeyer, the head of the Department, who turned in a final grade to the registrar. Both Dr. Boshell and Dr. Frommeyer gave appellant a failing grade, Dr. Boshell a 69 and Dr. Frommeyer a 60, and an "F" was turned in by Dr. Frommeyer as his grade on the course. An excerpt of the minutes of the March 5th meeting read:

"Frederick Mustell—The Department of Medicine reported that this student failed his course in third year medicine during the Winter Quarter of 1963–64 which has just ended. This student will have to repeat third year medicine during the Summer of 1964."

The evidence supports the awarding of a failure in medicine.

Grade in Surgery.

In 1963–64 Dr. Champ Lyons was Chairman of the Department of Surgery; Dr. Thomas B. Patton was a Professor of Surgery and Head of the Section of General Surgery; and next in line was the chief resident, the overall instructor, Dr. Eugene Sherlock.

At the time of the trial, Dr. Sherlock had left the Medical College and was Chief of Plastic Surgery at the Columbia Presbyterian Medical Center. He had an M. D. degree from the Medical College of Alabama, had interned there and had done four years general surgery at University Hospital. He was responsible for the hospital ward to which appellant was assigned. He testified that it was reported to him that appellant was not doing well in Surgery, that he knew himself that appellant was having difficulty, and approximately half way through the course, he reported to Dr. Patton that appellant was having difficulty and requested that Dr. Patton talk with appellant and get him to work harder. He further testified that at the end of the course, appellant was deficient as to his knowledge and qualifications in Surgery; that he gave appellant a grade of 80. He said, "80 would be the lowest grade. He would be low man on the totem pole in the group. It would be the lowest grade I would put." He said that at

the time he gave the grade he did not think appellant was qualified to pass the junior grade in Surgery and go into the senior grade. He testified that he had a conversation with Dr. Lyons about appellant's performance.

Dr. Patton testified that he talked with appellant during the term and told him they were worried about his ward work. Near the end of the term, he and other instructors gave appellant an oral examination and gave him a grade of 70, which was barely passing; and that it "was a rule that anyone receiving a grade of 70 or below on the oral examination would be referred to Dr. Lyons for his re-examination, for his counsel, or whatever else was deemed indicated." When he submitted a list of grades of the surgery students to Dr. Lyons, which showed appellant with a 70 on oral examination, he told Dr. Lyons "that Mr. Mustell was one of the individuals that we thought he should talk to."

Dr. Patton testified that under the procedure that was followed in the Department of Surgery that year, Dr. Lyons was the final arbiter in all gradings. He stated that the final grades he submitted to Dr. Lyons "were submitted for his perusal, for his comment, for his amendment, for his revision"; and they were not final until they were entered on a blue sheet by the Chairman of the Surgery Department, Dr. Lyons. Dean Hill also testified that it was up to the Chairman of the Department to put all the grades of the instructors in perspective, and make and arrive at the final grade.

The list of grades submitted to Dr. Lyons by Dr. Patton showed appellant and one other student with a grade of 70 on oral examination and one other student with a failing grade (65) on ward work. When next seen by Dr. Patton, a 65 had been written over the 70 by the name of appellant and one other student and the three 65 grades were circled and Dr. Lyons had written the word "FAIL" by each of the names.

Appellant admits that he was called in by Dr. Lyons on the morning of the day that the Promotions Committee met, that they had a five to ten minute discussion, but that Dr. Lyons did not examine him about the course in surgery and there "was never any discussion of surgery whatsoever."

This interview was on May 28, 1964. Dr. Lyons died on October 25, 1965, after a short illness. The instant suit was filed November 2, 1965.

We come now to the meeting of the Promotions Committee. Every person present at that meeting testified except Dr. Baird, who was ill at the time of the trial. The testimony was that Dr. Lyons, as Chairman of the Junior Promotions Committee, told them that three junior students were deficient in their subjects and the committee needed to discuss them. He named appellant as one of the students and it was brought up that appellant had been reported as having failed medicine at the March 5th meeting. All the people present at the May 28th meeting of the Promotions Committee testified that Dr. Lyons stated to them that he had just given the appellant an oral examination, and that he was inadequate in his knowledge of surgery and did not deserve to pass and be promoted. After a discussion, the vote was unanimous to recommend that appellant be dismissed from Alabama Medical College. Dr. Bentley testified that he sat next to Dr. Lyons and saw him write the word "FAIL" on the surgery grade sheet which Dr. Patton had turned in to Dr. Lyons.

The minutes of the meeting of the committee in reference to appellant read (except as to the names of two students):

"I. The Chairman asked the Committee to consider three third year students, two of whom had been brought up for discussion at the meeting of this committee on March 5, 1964. These students were:

"1. Mustell, Frederick * * * Medicine F; Surgery F; Pediatrics C

"2. * * *

"3. * * *

"The performance of each of the above three students was discussed in detail for their entire tenure in medical school. On the basis of each student's total evaluation, the committee recommended to the dean that each student be dropped from medical school.

"On the basis of each student's total evaluation, the committee recommended that the dean advise each student to change his field of interest."

Dean Hill testified that he heard the recommendation of the committee, he concurred in it, acted on it and notified appellant of the action taken.

We deem it appropriate to include the following testimony of Dean Hill:

"Q Can you tell us briefly who Dr. Lyons was, that is, his background; I understand he is dead now.

"A That is correct.

"Q Would you just give his background, please, as best you know?

"A Yes. Dr. Lyons was a graduate of medicine from Harvard Medical School. He was on the faculty at Harvard for a number of years. He was on the faculty of the Tulane University School of Medicine for a number of years. He came to the Medical College of Alabama as the first full-time chairman of the clinical department at the Medical College of Alabama, and I believe this was in about 1950, or thereabouts. Dr. Lyons was probably one of the most eminent professors of surgery in this country if not in the world. He has received many honors throughout his career. He was on many national and international councils and meetings. He was a very outstanding individual. He

had an outstanding department of surgery. He was an academician of the highest caliber, and one who always based his judgment on sound facts and one whose judgment, I think, was respected by everyone."

Where the evidence is heard orally before the trial court, the finding of the court has the effect of a jury's verdict and will not be disturbed on appeal, unless plainly erroneous, whether in law or equity. Norton v. Norton, 280 Ala. 307, 193 So.2d 750. We cannot say that the decree of the trial court was plainly erroneous.

Appellant argues that the decision that he be dismissed from school took place in his absence and that he was not permitted to be present at the hearing, and cites Dixon v. Alabama State Board of Education, 5 C.A., 294 F.2d 150. That case is not apt authority. The dismissal there was based upon misconduct, not deficiency in grades. Even the federal courts have not yet gone so far as to require the notice and presence of the student when a decision is being reached to dismiss a student for failing to meet the required scholastic standards. In Barnard v. Inhabitants of Shelburne, 216 Mass. 19, 102 N.E. 1095, it was said:

" * * * Misconduct is a very different matter from failure to attain a standard of excellence in studies. A determination as to the fact involves investigation of a quite different kind. A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship."

See Annotation, 58 A.L.R.2d 903, at 906; Woody v. Burns, Fla.App., 188 So.2d 56.

Affirmed.

LIVINGSTON, C. J., and HARWOOD and KOHN, JJ., concur.