COBB, Chief Justice.
This is an appeal from a summary judgment denying the equitable relief requested by the plaintiff, John W. Burch (“Burch”), on the basis that V. Gordon Moulton and the other defendants, all affiliated in some way with the University of South Alabama (“USA”),[1] are protected by *394 the doctrine of State immunity. In April 2003, just before his scheduled graduation from USA’s college of medicine but while on nonacademic probation at that institution, Burch was arrested for the unlawful possession of prescription drugs and pleaded guilty to a misdemeanor charge of possession of drug paraphernalia; he was placed on “administrative leave” from the college of medicine. In May 2004, after Burch completed a drug-treatment program, the student promotions and evaluation committee (“SPEC”) of the college of medicine met to evaluate Burch’s eligibility for graduation and to make a recommendation to Dr. Robert A. Kreisberg, then dean of the college of medicine. Dean Kreisberg subsequently approved the SPEC’s recommendation that Burch be dismissed from the college of medicine. After he was dismissed, Burch sued USA; the college of medicine itself; Dr. J. Allan Tucker, a professor of the college of medicine; V. Gordon Moulton, the president of USA; the Board of Trustees of USA and the individual trustees; Dean Kreisberg; Dr. M. Margaret O’Brien, associate dean of the college of medicine; and the individual members of the SPEC. Burch sought an order requiring the defendants to issue to him the degree of doctor of medicine. The defendants filed a motion for a summary judgment, asserting as a defense the doctrine of State immunity. The trial court entered a summary judgment for the defendants on the ground of State immunity-
Our standard of review for a summary judgment is settled:
“In reviewing the disposition of a motion for summary judgment, ‘we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,’ Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was ‘entitled to a judgment as a matter of law.’ Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993) *395 [overruled on other grounds, Bruce v. Cole, 854 So.2d 47 (Ala.2003) ]; Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).”
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
The college of medicine, a division of USA, is supported by the State of Alabama and is therefore considered a State institution. Students must meet both “scholastic-cognitive” requirements and “scholastic-noncognitive” standards in order to graduate. Cognitive requirements concern academic performance, e.g., standardized grades, courses, and examinations. Noncognitive standards address behaviors deemed necessary by the college of medicine for a career in medicine, e.g., attentiveness, cooperation, responsibility, and maturity.
Burch began his first semester of medical school in the fall of 1998. Burch was required to repeat two of his courses and was placed on academic probation until May 2000, when his grades improved significantly. He was scheduled to graduate with the class of 2003. During his medical-school career, Burch received numerous complaints relating to the noncognitive standards, including reports of difficulty with authority, a lack of attentiveness, an unwillingness to cooperate, and poor attendance. Burch was eventually placed on noncognitive probation in August 2001 based on his delay in taking the United States Medical Licensing Examination (“USMLE”), Step 1, a required exam, the complaints concerning his failure to meet noncognitive standards, and his significantly late arrival to his first day of a scheduled psychiatry rotation. Burch was still on noncognitive probation when he was arrested in April 2003. Before his arrest, Burch had received a letter dated February 28, 2003, from Dr. Betsy Bennett, then vice dean for student affairs and medical education, outlining the many obstacles Burch had to overcome in order to graduate. That letter stated, in pertinent part:
“As I made clear to you, I cannot include your name on the list of students to be approved for graduation unless it is clear that you will meet all graduation requirements by May 9. The Executive Council must approve this list at its April 1 meeting. Based on your failure to send in your application [for the USMLE Step 2 test] as instructed, it will be impossible for you to have scheduled the examination by that time.... Therefore, I am forced to omit your name from the graduation list.
“An additional complicating factor is the fact that you remain on non-cognitive probation and must be removed from probation by the [SPEC] before you can be approved to graduate. [The SPEC] will not remove you from probation until it is clear that you will meet all graduation requirements....
“At this point it is impossible for you to receive a diploma on May 10. Even if you are able to schedule USMLE during the last two weeks of April, we will not receive your scores before graduation. Should you somehow manage to get credit for the two week rotation that you are missing, take and pass ACLS [advanced cardiac life support exam], take USMLE Step 2, be removed from non-cognitive probation by SPEC, get dispensation from the Executive Council to be approved for graduation, and choose to participate in graduation activities, you would receive an empty diploma cover. Your diploma would be mailed to you after we receive a passing score on USMLE Step 2.
“You have spent five years of your time and a great deal of borrowed money to reach this point. Having done that, it seems unfortunate to put your *396 self in a position not to graduate. However, if you do not intend to comply with the graduation requirements, I would suggest that you consider actively, rather than passively, withdrawing from school. There is no need to force us to dismiss you for not fulfilling these criteria.”
Dr. Bennett drafted another letter dated April 25, 2003, informing Burch that because he had not yet scheduled his USMLE Step 2 test, a meeting of the SPEC had been scheduled for May 8, 2003, to discuss his failure to meet the requirements for graduation. Dr. Bennett was not aware when she drafted the letter that Burch had been arrested in the early morning hours of April 25, 2003.
During his arrest, Burch consented to a search of his automobile; the search produced not only tablets of Adderall (an amphetamine) and acyclovir, but also a signed but otherwise blank prescription form and a partially used prescription pad. Burch admitted to using the illegally obtained Adderall to help stay awake and the acyclovir, also illegally obtained, for another condition. At a meeting of the SPEC at which his arrest was discussed, Burch stated:
“[I]t was after my Family Practice rotation that I illegally used a prescription pad.... I basically, you know, forged prescriptions, you know, you know, and had it filled at a pharmacy with a friend....”
A letter written by Dr. Bennett, dated April 30, 2003, and hand delivered to Burch, stated:
“Given our discussion this morning and your statement to me that you have an addiction to prescription drugs, it is clear that no decision on your academic status is possible until you have completed a course of rehabilitation therapy....
“I cannot make any promises about your academic future after your therapy is completed. That decision will rest with the [SPEC] and will depend on input from Ms. Rogers[2] and your therapists as well as from you. However, as I said this morning, your first priority is treatment and we will deal with other issues when that is completed.”
Immediately following his arrest, the college of medicine relieved Burch of all clinical responsibilities. On May 28, 2003, the SPEC placed Burch on administrative leave from the college of medicine pending resolution of his legal matters and the completion of a drug-treatment program. A subsequent meeting of the SPEC was held in December 2003 to discuss Burch’s status; Burch was present at the meeting and spoke on his own behalf. Following the meeting, the SPEC recommended to Dean Kreisberg that Burch be dismissed. Burch appealed the decision, and another meeting of the SPEC was scheduled.
The final SPEC meeting regarding Burch’s dismissal was conducted on May 13, 2004.[3] Burch’s attorney was present but, in accordance with school policy, was not allowed to participate. A faculty member, Dr. Kenneth Rettig, was also appointed to represent Burch. The specific charge against Burch to be discussed at the SPEC meeting was that “he engaged in criminal activity leading to his arrest and subsequent guilty plea while he was on non-cognitive probation in the College of Medicine.” At the meeting, matters per *397 taining to Burch’s arrest, his cognitive medical-school record, noncognitive medical-school record, and substance-abuse treatment were all discussed. The SPEC again recommended Burch’s dismissal to Dean Kreisberg, who was the final authority in these matters. Burch met with Dean Kreisberg on May 17, 2004, after learning of the recommendation of the SPEC. Dean Kreisberg stated the following in deposition regarding his meeting with Burch:
“I suggested that he write me a personal letter expressing and confirming his commitment to become a physician in the face of these important obstacles. He indicated he would get the letter to me in several days since he would be leaving shortly for California and had other important commitments. I indicated that I would request a meeting with SPEC after receipt of his letter. By June 2nd I had not received a letter and I upheld the recommendation of SPEC....
“I’m saying that it wasn’t important enough to him in the face of the seriousness of all of this to respond in a reasonable period of time and it was consistent with all of his lack of cognitive — or all of the non-eognitive problems that he has had throughout the entirety of his medical school career.”
Burch eventually wrote a letter to Dean Kreisberg dated June 11, 2004. Burch did not appeal the decision reached at the final meeting of the SPEC; instead, he filed this action in the Mobile Circuit Court seeking an order requiring the defendants to “confer unto (Burch) the degree of doctor of medicine.”
Controlling caselaw indicates that the defendants are to be protected by State immunity unless a recognized exception applies. In Alabama Agricultural & Mechanical University v. Jones, 895 So.2d 867 (Ala.2004), this Court construed § 14, Ala. Const.1901, as follows:
“Section 14 provides: ‘That the State of Alabama shall never be made a defendant in any court of law or equity.’ Speaking of § 14, this Court has said:
“ ‘The wall of immunity erected by § 14 is nearly impregnable.... ’
“... Thus, actions against officers, trustees, and employees of state universities in their official capacities are likewise barred by § 14.”
895 So.2d at 872-78. The following actions are not to be considered actions against the State and therefore are not subject to the defense of State immunity:
“ ‘(1) Actions brought to compel State officials to perform their legal duties. (2) Actions brought to enjoin State officials from enforcing an unconstitutional law. (3) Actions to compel State officials to perform ministerial acts. (4) Actions brought under the Declaratory Judgments Act [Ala.Code 1975, § 6-6-220 et seq.], seeking construction of a statute and how it should be applied in a given situation.’ ”
Alabama Agric. & Mech. Univ., 895 So.2d at 873 (quoting Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002)).
Burch does not debate that the defendants are State entities or agents; he states:
“The University was created by the State of Alabama as a public body corporate and the College of Medicine is but a part [of] it. Ala.Code § 16-55-1 et seq. The other defendants are University Trustees, officers or employees and its Medical College and, as such, are ‘state agents.’ ”
However, Burch argues that the defendants should not enjoy the protection of State immunity because, he argues, the defendants violated Burch’s right to due *398 process, failed to perform a ministerial act, i.e., awarding him a degree, and acted willfully, maliciously, arbitrarily, and capriciously. In essence, Burch alleges that the defendants are not protected by State immunity because, he says, their acts in denying him a medical degree were arbitrary or in bad faith.
Burch argues that the defendants have a legal duty to grant him a medical degree because, he says, he has met, or if allowed would have met, the necessary requirements for graduation from the college of medicine. As referenced above in the letter from Dr. Bennett to Burch dated February 28, 2003, the record shows that at the time of his arrest in April 2003 Burch lacked many of the requirements necessary to graduate. This Court has recognized that parties like the defendants have discretion in determining a student’s academic status and that if that discretion is not exceeded, their immunity from suit is not compromised. In Mustell v. Rose, 282 Ala. 358, 211 So.2d 489 (1968), a former medical-school student sought reinstatement as a medical student. This Court noted:
“ ‘It has been said that courts do not interfere with the management of a school’s internal affairs unless “there has been a manifest abuse of discretion or where (the school officials’) action has been arbitrary or unlawful,” State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822 [(1942)], cert. den. 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703 (194[3]), or unless the school authorities have acted “arbitrarily or capriciously,” Frank v. Marquette University, 209 Wis. 372, 245 N.W. 125 (1932), or unless they have abused their discretion, Coffelt v. Nicholson, 224 Ark. 176, 272 S.W.2d 309 (1954), People ex rel. Bluett v. Board of Trustees of University of Illinois, 10 Ill.App.2d 207, 134 N.E.2d 635, 58 A.L.R.2d W. 899 (1956), or acted in “bad faith,” Barnard v. Inhabitants of Shelburne, supra, 216 Mass. 19, 102 N.E. 1095 [ (1913) ], and see 222 Mass. 76, 109 N.E. 818 [ (1915) ] (same ease).
“ ‘The effect of these decisions is to give the school authorities absolute discretion in determining whether a student has been delinquent in his studies, and to place the burden on the student of showing that his dismissal was motivated by arbitrariness, eapriciousness or bad faith. The reason for this rule is that in matters of scholarship, the school authorities are uniquely qualified by training and experience to judge the qualifications of a student, and efficiency of instruction depends in no small degree upon the school faculty’s freedom from interference from other noneducational tribunals. It is only when the school authorities abuse this discretion that a court may interfere with their decision to dismiss a student.’ ”
282 Ala. at 363, 211 So.2d at 493. Even before Burch’s arrest, a meeting of the SPEC had been scheduled to discuss Burch’s “obstacles” to graduation, indicating that Burch had not yet met the requirements for graduation. Dr. M. Margaret O’Brien, associate dean of student affairs of the college of medicine and a defendant below, described in her deposition the discretionary process of recommending students for graduation:
“It’s my understanding that if a student fulfills the requirements for graduation and is recommended to the President, the President ultimately confers the degrees of graduation.... On the College of Medicine side, we have a committee called the Student Promotions and Evaluation Committee which basically throughout the course of each medical student’s tenure at the College of Medicine the committee promotes them and *399 evaluates them. The committee is also the mechanism for discipline.
“In order to graduate, the SPEC — and that’s spelling S-P-E-C — would recommend the candidates for graduation.”
Certainly the faculty of the college of medicine is well aware of the requirements for graduation, as set out in the college of medicine’s guidelines and comprising both cognitive and noncognitive criteria, that a student must meet to earn a medical degree, and it is within their discretion to award or decline to award such a degree. We conclude that Burch has made no showing that the defendants’ refusal to award him a medical degree was arbitrary or in bad faith or that in refusing to award him a medical degree they exceeded their discretion over his academic career as recognized in Mustell, supra.
Burch asserts that recommending a candidate for graduation from medical school is merely a ministerial act. “Actions to compel State officials to perform ministerial acts” are not considered actions against the State, thereby lifting the protection of State immunity. Alabama Agric. & Mech. Univ., 895 So.2d at 873. Burch asserts that his action is one to compel the defendants to perform a ministerial act, i.e., that the requirements for graduation are simply a “checklist,” that he had met all the requirements necessary for graduation, and that recommending him for graduation was simply a ministerial act. However, our review of the record discloses ample evidence showing that the process of recommending students for graduation requires the defendants to exercise discretion in evaluating a candidate’s compliance with the prescribed guidelines and is not merely a ministerial act.
Among the evidence establishing that the defendants were exercising their discretion here are many instances in which the faculty attempted to aid Burch through correspondence or counsel regarding areas of deficiency during his years as a student at the college of medicine. There was no other student-disciplinary proceeding with which to compare Burch’s. No other student had been arrested while he or she was on noncognitive probation, and more specifically no student had ever admitted to forging prescriptions from a stolen prescription pad. Our review of the record of Burch’s unique case discloses no action by the defendants that could be determined to be, as Burch argues, arbitrary, capricious, or in bad faith. In a similar action regarding a meeting of the SPEC at which a student’s dismissal from the college of medicine was considered, the United States District Court for the Southern District of Alabama stated:
“While the evidence reflects that different students were treated differently and accorded individual treatment, this is to be expected by a committee considering the entire academic record of many different students. This Court would only be persuaded by the plaintiffs arguments on this point where there was evidence that a student with an academic record and an individual history very similar to the plaintiffs was afforded substantially different treatment from that received by the plaintiff.”
Watson v. University of South Alabama College of Medicine, 463 F.Supp. 720, 727 (D.C.Ala.1979). Our review of the record reveals that Burch presented no evidence indicating that the conduct of any individual defendant was willful, malicious, arbitrary, capricious, or in bad faith.[4]
*400 Burch also argues that his due-process rights were violated when he was denied a medical degree. We note that the United States Court of Appeals for the Eleventh Circuit recognized that actions resulting in the denial of due process could be sufficiently arbitrary to breach the protection afforded by State immunity when it evaluated a due-process claim brought by two students suspended from Auburn University’s veterinary school. In Nash v. Auburn University, 812 F.2d 655 (11th Cir.1987), the Court of Appeals for the Eleventh Circuit held that the students had received a fair meeting, and it summarized procedural due-process claims in an academic setting as follows:
“ ‘The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.’ Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citation omitted). What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances. Id. at 334, 96 S.Ct. 893, 902, Goss v. Lopez, 419 U.S. 565, 577-78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). That flexible standard was translated by the Goss court to mean that high school students facing the deprivation of a property right by suspension from school must, at a minimum, ‘be given some kind of notice and afforded some kind of meeting.’ 419 U.S. at 579, 95 S.Ct. at 738 (emphasis in original). In Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), we broadly defined the notice and hearing required in cases of student expulsion from college: ‘[A]n opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required.’ Id. at 159.”
812 F.2d at 660.
We conclude that Burch was afforded far more than “the opportunity to be heard at a meaningful time and in a meaningful manner” due-process requirement mentioned above. In fact, Burch had numerous meetings with the SPEC, was given ample notice of the requirements he had to meet in order to graduate, and was made aware of both his rights and the complaints against him. Burch was allowed the opportunity at the SPEC meeting to call witnesses, to testify on his own behalf, and to have an attorney present. A member of the faculty was appointed to represent Burch as an advocate who cross-examined witnesses on Burch’s behalf. Burch chose not to appeal the SPEC’s recommendation of dismissal. The SPEC reported its recommendation to Dean Kreisberg, with whom the final decision for dismissal rested.
Burch further argues that his due-process rights were violated because he was not privileged to the communications between the SPEC and Dean Kreisberg, through Dr. O’Brien. We do not agree. Burch had an extensive meeting with the SPEC and was allowed to meet with Dean Kreisberg individually after Dean Kreis-berg received the SPEC’s recommendation. Following that meeting, Dean Kreis-berg gave Burch the opportunity to submit a letter conveying the reasons Burch believed that he should be allowed to graduate. However, Burch was tardy with his reply, and Dean Kreisberg approved the recommendation of the SPEC before Burch replied. After reviewing the record *401 as it pertains to the SPEC meeting and taking into consideration the facts that Burch chose not to appeal the SPEC recommendation and was tardy in his reply to Dean Kreisberg, we conclude that Burch has suffered no violation to his due-process rights.
Based on our careful review of the record, we believe that no reasonable person could determine that a genuine issue exists in regard to the trial court’s determination that the defendants acted within their discretion in refusing to award Burch a medical degree and that Burch’s due-process rights were not violated in the process. The defendants therefore were entitled to State immunity. Because we conclude that the trial court correctly found that there was no disputed issue of material fact and that the defendants were entitled to a judgment as a matter of law, we affirm the summary judgment.
AFFIRMED.
SEE, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
LYONS and MURDOCK, JJ., concur in the result.

. All the defendants listed in the complaint as amended are as follows: Dr. V. Gordon Moul- *394 ton, president of the University of South Alabama; the Board of Trustees of the University of South Alabama; Jack R. Brunson, J.L. Chestnut, Jr., E. Crum Foshee, J. Cecil Gardner, Samuel L. Jones, Larry P. Langford, Donald L. Langham, W.H. “Pat” Lindsey, Bettye R. Maye, Christie D. Miree, Mayer Mitchell, Bryant Mixon, James P. Nix, Dr. Joseph B. Morton, Dr. Steven H. Stokes, Larry D. Striplin, Jr., and Governor Bob Riley, in their capacities as trustees of the University of South Alabama; Dr. Robert A. Kreisberg, dean of the college of medicine of the University of South Alabama; Dr. M. Margaret O'Brien, associate dean of student affairs of the college of medicine; and fictitiously named defendants 1 through 100, members of the medical student promotions and evaluation committee of the college of medicine of the University of South Alabama; the University of South Alabama; the College of Medicine of the University of South Alabama; and Dr. J. Allan Tucker, professor at the college of medicine.

. Ms. Esther Rogers is employed as the employee assistance counselor for a drug-free workplace at USA hospitals and campus.

. By the time of the May 13, 2004, meeting, Dr. Bennett had been replaced by Dr. Margaret O'Brien and the title of the position changed from vice dean to associate dean for student affairs.

. Burch specifically asserts that Dr. O'Brien acted in bad faith. It is important to note that Dr. O’Brien did not assume the role of associate dean of student affairs until October *400 2003, several months following Burch’s arrest. Dr. O’Brien’s role was limited, and no evidence was presented to indicate that her conduct was anything other than professional.